**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,
United States Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 7000
Washington, DC  20530

STATE OF CALIFORNIA,
Office of the Attorney General
CSB No. 184162
300 South Spring Street, Suite 1702
Los Angeles, CA  90013

STATE OF FLORIDA,
Antitrust Division
PL-01, The Capitol
Tallahassee, FL  32399-1050

STATE OF MISSOURI,
Missouri Attorney General's Office
P.O. Box 899
Jefferson City, MO  65109

STATE OF TEXAS,
Office of the Attorney General
300 W. 15th Street, 7th Floor
Austin, TX  78701

and

STATE OF WASHINGTON,
Office of the Attorney General of Washington
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188

> *Plaintiffs,*

> v.

COMCAST CORP.,
1 Comcast Center
Philadelphia, PA  19103

GENERAL ELECTRIC CO.,
3135 Easton Turnpike
Fairfield, CT  06828

and

NBC UNIVERSAL, INC.,
30 Rockefeller Plaza
New York, NY  10112

*Defendants.*

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the

United States, and the States of California, Florida, Missouri, Texas, and Washington, acting

under the direction of their respective Attorneys General or other authorized officials ("Plaintiff

States") (collectively, "Plaintiffs"), bring this civil action pursuant to the antitrust laws of the

United States to permanently enjoin a proposed joint venture ("JV") and related transactions

between Comcast Corporation ("Comcast") and General Electric Company ("GE") that would

allow Comcast, the largest cable company in the United States, to control some of the most

popular video programming among consumers, including the NBC Television Network ("NBC

broadcast network") and the cable networks of NBC Universal, Inc. ("NBCU").  If the JV

proceeds, tens of millions of U.S. consumers will pay higher prices for video programming

distribution services, receive lower-quality services, and enjoy fewer benefits from innovation.

To prevent this harm, the United States and the Plaintiff States allege as follows:

### I.  INTRODUCTION AND BACKGROUND

1.      This case is about how, when, from whom, and at what price the vast majority of

American consumers will receive and view television and movie content.  Increasingly,

consumers are demanding new ways of viewing their favorite television shows and movies at

times convenient to them and on devices of their own choosing.  Consumers also are demanding alternatives to high monthly prices charged by cable providers, such as Comcast, for hundreds of channels of programming that many of them neither desire nor watch.

2.      Today, consumers buy video programming services only from the distributors serving their local areas.  Incumbent cable companies continue to serve a majority of customers, offering services consisting of multiple channels of linear or scheduled programming.  Beginning in the mid-1990s, cable companies first faced competition from the direct broadcast satellite ("DBS") providers.  More recently, firms that traditionally offered only voice telephony services – the telephone companies or "telcos," such as AT&T and Verizon – have emerged as competitors.  The video programming offerings of these competitors are similar to the cable incumbents' programming packages, and their increased competition has pushed cable companies to offer new features, including additional channels, digital transmission, video-on-demand ("VOD") offerings, and high-definition ("HD") picture quality.

3.      Most recently, online video programming distributors ("OVDs") have begun to provide professional video programming to consumers over the Internet.  This programming can be viewed at any time, on a variety of devices, wherever the consumer has high-speed access to the Internet.  Cable companies, DBS providers, and telcos have responded to this entry with further innovation, including expanding their VOD offerings and allowing their subscribers to view programming over the Internet under certain conditions.

4.      Through the JV, Comcast seeks to gain control of NBCU's programming, a potent tool that would allow it to disadvantage its traditional video programming distribution competitors, such as cable, DBS, and the telcos, and curb nascent OVD competition by denying access to, or raising the cost of, this important content.  If Comcast is allowed to exercise control

3

over this vital programming, innovation in the market for video programming distribution will be diminished, and consumers will pay higher prices for programming and face fewer choices.

5. Attractive content is vital to video programming distribution. Today, consumers subscribe to traditional video programming distributors in order to view their favorite programs (scheduled or on demand), discover new shows and networks, view live sports and news, and watch old and newly available movies. Distributors compete for viewers by marketing the rich array of programming and other features available on their services. This marketing often promotes programming that is exclusive to the distributor or highlights the distributor's rivals' lack of specific programming or features.

6. NBCU content, especially the NBC broadcast network, is important to consumers and video programming distributors' ability to attract and retain customers. Programming is often at the center of disputes between subscription video programming distributors and broadcast and cable network owners. The public outcry when certain programming is unavailable, even temporarily, underscores the damage that can occur when a video distributor loses access to valuable programming. The JV will give Comcast control over access to valuable content, and the terms on which its rivals can purchase it, including the possibility of denying them the programming entirely.

7. NBCU content is especially important to OVDs. NBCU has been an industry leader in making its content available over the Internet. If OVDs cannot gain access to NBCU content, their ability to develop into stronger video programming distribution competitors will be impeded.

8. Comcast itself recognizes the importance of the NBC broadcast network, which it describes as an "American icon." NBC broadcasts such highly rated programming as the

Olympics, *Sunday Night Football*, *NBC Nightly News*, *The Office*, *30 Rock*, and *The Today Show*. NBCU also owns other important programming, including the USA Network, the number-one-rated cable channel; CNBC, the leading cable financial news network; other top-rated cable networks, such as Bravo and SyFy; and The Weather Channel, in which it holds a significant stake and has management rights.

9.      Comcast faces little video programming distribution competition in many of the areas it serves. Entry into traditional video programming distribution is expensive, and new entry is unlikely in most areas. OVDs' Internet-based offerings are likely the best hope for additional video programming distribution competition in Comcast's cable franchise areas.

10.     Thus, the United States and the Plaintiff States ask this Court to enjoin the proposed JV permanently.

## II.  JURISDICTION AND VENUE

11.     The United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain Comcast, GE, and NBCU from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

12.     The Plaintiff States, by and through their respective Attorneys General and other authorized officials, bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Comcast, GE, and NBCU from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. The Plaintiff States bring this action in their sovereign capacities and as *parens patriae* on behalf of the citizens, general welfare, and economy of each of the Plaintiff States.

13.     In addition to distributing video programming, Comcast owns programming. Comcast and NBCU sell programming to distributors in the flow of interstate commerce. Comcast's and NBCU's activities in selling programming to distributors, as well as Comcast's

activities in distributing video programming to consumers, substantially affect interstate commerce and commerce in each of the Plaintiff States. The Court has subject-matter jurisdiction over this action and these defendants pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

14.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)(1) and (c). Defendants Comcast, GE, and NBCU transact business and are found within the District of Columbia. Comcast, GE, and NBCU have submitted to personal jurisdiction in this District.

### III.  DEFENDANTS AND THE PROPOSED JOINT VENTURE

15.     Comcast is a Pennsylvania corporation headquartered in Philadelphia, Pennsylvania. It is the largest video programming distributor in the nation, with approximately 23 million video subscribers. Comcast is also the largest high-speed Internet provider, with over 16 million subscribers for this service. Comcast wholly owns national cable programming networks, including E! Entertainment, G4, Golf, Style, and Versus, and has partial interests in Current Media, MLB Network, NHL Network, PBS KIDS Sprout, Retirement Living Television, and TV One. In addition, Comcast has controlling interests in the following regional sports networks ("RSNs"): Comcast SportsNet ("CSN") Bay Area, CSN California, CSN Mid-Atlantic, CSN New England, CSN Northwest, CSN Philadelphia, CSN Southeast, and CSN Southwest; and partial interests in three other RSNs: CSN Chicago, SportsNet New York, and The Mtn. Comcast also owns digital properties such as DailyCandy.com, Fandango.com, and Fancast, its online video website. In 2009, Comcast reported total revenues of $36 billion. Over 94 percent of Comcast's revenues, or $34 billion, were derived from its cable business, including $19 billion from video services, $8 billion from high-speed Internet services, and $1.4 billion

from local advertising on Comcast's cable systems.  In contrast, Comcast's cable programming networks earned only about $1.5 billion in revenues from advertising and fees collected from video programming distributors.

16.     GE is a New York corporation with its principal place of business in Fairfield, Connecticut.  GE is a global infrastructure, finance, and media company.  GE owns 88 percent of NBCU, a Delaware corporation, with its headquarters in New York, New York.  NBCU is principally involved in the production, packaging, and marketing of news, sports, and entertainment programming.  NBCU wholly owns the NBC and Telemundo broadcast networks, as well as ten local NBC owned and operated television stations ("O&Os"), 16 Telemundo O&Os, and one independent Spanish-language television station.  Seven of the NBC O&Os are located in areas in which Comcast has incumbent cable systems – Chicago, Hartford/New Haven, Miami, New York, Philadelphia, San Francisco, and Washington, DC.  In addition, NBCU wholly owns national cable programming networks – Bravo, Chiller, CNBC, CNBC World, MSNBC, mun2, Oxygen, Sleuth, SyFy, and the USA Network – and partially owns A&E Television Networks (including the Biography, History, and Lifetime cable networks), The Weather Channel, and ShopNBC.

17.     NBCU also owns Universal Pictures, Focus Films, and Universal Studios, which produce films for theatrical and digital video disk ("DVD") release, as well as content for NBCU's and other companies' broadcast and cable programming networks.  NBCU produces approximately three-quarters of the original, primetime programming shown on the NBC broadcast network and the USA cable network – NBCU's two highest-rated networks.  In addition to its programming-related assets, NBCU owns several theme parks and digital

properties, such as iVillage.com.  Finally, NBCU is a founding partner and 32 percent owner of Hulu, LLC, an OVD.  In 2009, NBCU had total revenues of $15.4 billion.

18.     On December 3, 2009, Comcast, GE, NBCU, and Navy, LLC ("Newco"), a Delaware corporation, entered into a Master Agreement, whereby Comcast agreed to pay $6.5 billion in cash to GE, and Comcast and GE each agreed to contribute certain assets to the JV to be called Newco.  Specifically, GE agreed to contribute all of the assets of NBCU, including its interest in Hulu and the 12 percent interest in NBCU it does not currently own but has agreed to purchase from Vivendi SA.  Comcast agreed to contribute all its cable programming assets, including its national networks as well as its RSNs, and some digital properties, but not its cable systems or its online video website, Fancast.  As a result of the content contributions and cash payment by Comcast, Comcast will own 51 percent of the JV, and GE will retain a 49 percent interest.  The JV will be managed by a separate board of directors initially consisting of three Comcast-designated directors and two GE-designated directors.  Board decisions will be made by majority vote.

19.     Comcast is precluded from transferring its interest in the JV for a four-year period, and GE is prohibited from transferring its interest for three and one-half years.  Thereafter, either party may sell its respective interest in the JV, subject to Comcast's right to purchase at fair market value any interest that GE proposes to sell.  Additionally, three and one-half years after closing, GE will have the right to require the JV to redeem 50 percent of GE's interest; after seven years, GE will have the right to require the JV to redeem all of its remaining interest.  If GE elects to exercise its first right of redemption, Comcast will have the contemporaneous right to purchase the remainder of GE's ownership interest once a purchase price is determined.  If GE does not exercise its first redemption right, Comcast will have the

right to buy 50 percent of GE's initial ownership interest five years after closing and all of GE's remaining ownership interest eight years after closing.  It is expected that Comcast ultimately will own 100 percent of the JV.

## IV.  THE PROFESSIONAL VIDEO PROGRAMMING INDUSTRY

20.     The professional video programming industry has had three different levels: content production, content aggregation or networks, and distribution.

### A.  Content Production

21.     Television production studios produce television shows and license that content to broadcast and cable networks.  Content producers typically retain the rights to license their content for syndication (*e.g.*, licensing of series to networks or television stations after the initial run of the programming) as well as for DVD distribution and VOD or pay-per-view ("PPV") services.  In addition to first-run rights (*i.e.*, the rights to premiere the content), content producers such as NBCU also license the syndication rights to their own programming to broadcast and cable networks.  For example, *House* is produced by NBCU, licensed for its first run on the FOX broadcast network, and then rerun on the USA Network, a cable network owned by NBCU.  These content licenses often include ancillary rights to related content (*e.g.*, short segments of programming or clips, extras such as cast interviews, camera angles, and alternative feeds), as well as the right to offer some programming on demand (both online and through traditional cable, satellite, and telco distribution methods).

22.     A content owner controls which entity receives its programming and when, through a process known as "windowing."  Historically, the first television release window was reserved for broadcast on one of the four major broadcast networks (ABC, CBS, NBC, and FOX), followed by broadcast syndication, and, ultimately, cable syndication.  Over the past

couple of years, however, content owners have created new windows and begun to allow their content to be distributed over the Internet on either a catch-up (*e.g.*, next day) or syndicated (*e.g.*, next season) basis.

23.     In addition to producing content for television and cable networks, NBCU produces and distributes first-run movies through Universal Pictures, Universal Studios, and Focus Films.  Typically, these movies are distributed to theaters before being released on DVD, then licensed to VOD/PPV providers, then to premium cable channels (*e.g.*, Home Box Office ("HBO")), then to regular cable channels, and finally to broadcast networks.  As they have with television distribution, over the past several years content owners have experimented with different windows for distributing films over the Internet.

### B.  Programming Networks

24.     Networks aggregate content to provide a 24-hour-per-day service that is attractive to consumers.  The most popular networks, by far, are the four broadcast networks.  The first cable network was HBO, which launched in the early 1970s.  Since then, cable networks have grown in popularity and number.  As of the end of 2009, there were an estimated 600 national, plus another 100 regional, cable programming networks.  More than 100 of these networks were also available in HD.

### 1.  Broadcast Networks

25.     Owners of broadcast network programming or broadcasters (*e.g.,* NBCU) license their broadcast networks (*e.g.*, NBC, Telemundo) either to third-party television stations affiliated with that network ("network affiliates"), or to their owned and operated television stations or O&Os.  The network affiliates and O&Os distribute the broadcast network feeds over the air to the public and, importantly, retransmit them to professional video programming

distributors such as cable companies and DBS providers, which in turn distribute the feeds to their subscribers.

26.     The Cable Television Consumer Protection and Competition Act of 1992 ("1992 Cable Act"), Pub. L. No. 102-385, 106 Stat. 1460 (1992), gave broadcast television stations, whether network affiliates or O&Os, the option to demand "retransmission consent," a process through which a distributor negotiates with the station for the right to carry the station's programming for agreed-upon terms.  Alternatively, stations can elect "must carry" status, which involves a process through which the station can demand to be carried without compensation. Stations affiliated with the four major broadcast networks, including the O&Os, all have elected retransmission consent.  Historically, these stations negotiated for non-monetary reimbursement (*e.g.*, carriage of new cable channels) in exchange for retransmission consent.  Today, most broadcast stations seek fees based on the number of subscribers to the cable, DBS, or telco service distributing their content.  Less popular broadcast networks generally have elected must carry status, although recently they also have begun to negotiate retransmission payments.

27.     In the past, NBCU has negotiated the retransmission rights only for its O&Os, but it has expressed interest in and made efforts to obtain the rights from its NBC broadcast network affiliates to negotiate retransmission consent agreements on their behalf.  NBCU could also seek to renegotiate its agreements with its affiliates to obtain a share of any retransmission consent fees the affiliates are able to command.

### 2. Cable Networks

28.     In addition to the broadcast networks, programmers produce cable networks and sell them to video programming distributors.  Most cable networks are based on a dual revenue-stream business model.  They derive roughly half their revenues from licensing fees paid by

distributors and the other half from advertising fees.  The revenue split varies depending on several factors, including the type of programming (*e.g.*, financial news or general entertainment) and whether the program is established or newly launched.

29.     Generally, an owner of a cable network receives a monthly per-subscriber fee that may vary based upon the popularity or ratings of a network's programming, the volume of subscribers served by the distributor, the packages in which the programming is included, the percentage of the distributor's subscribers receiving the programming, and other factors.  In addition to the right to carry the network, a distributor of the cable network often receives two to three minutes of advertising time per hour on the network that it can sell to local businesses (*e.g.*, car dealers).  A distributor may also receive marketing payments or discounts to encourage greater penetration of its potential consumers.  In the case of a completely new cable network, a programmer may pay a distributor to carry the network or offer other discounts.

30.     Over time, some video programming distributors, such as Comcast and Cablevision Corp., have purchased or launched their own cable networks.  Vertical integration between content and distribution was a reason for the passage of Section 19 of the 1992 Cable Act, 47 U.S.C. § 548.  Pursuant to the Act, Congress directed the Federal Communications Commission ("FCC") to promulgate rules that place restrictions on how cable programmers affiliated with a cable company can deal with unaffiliated distributors.  These "program access rules" apply to a cable company that owns a cable network, and prohibit both the cable company and the network from engaging in unfair acts or practices, including (1) entering into exclusive agreements for the cable network; (2) selling the cable network to the cable company's competitors on discriminatory terms and conditions; and (3) unduly influencing the cable network in deciding whom, and on what terms and conditions, to sell its programming.

47 C.F.R. §§ 76.1001-76.1002.  The prohibition on exclusivity sunsets in October 2012, unless

extended by the FCC after a rulemaking proceeding.  The program access rules do not apply to

online distribution or to retransmission of broadcast station content.

### C. Professional Video Programming Distribution

31.    Video programming distributors acquire the rights to transmit professional, full-

length broadcast and cable programming networks or individual programs or movies, aggregate

the content, and distribute it to their subscribers or users.

#### 1. Multichannel Video Programming Distributors ("MVPDs")

32.    Traditional video programming distributors offer hundreds of channels of

professional video programming to residential customers for a fee.  They include incumbent

cable companies, DBS providers, cable overbuilders, also known as broadband service providers

or "BSPs" (*e.g.*, RCN), and telcos.  These distributors are often collectively referred to as

MVPDs ("multichannel video programming distributors").  In response to increasing consumer

demand to record and view video content at different times, many MVPDs offer services such as

digital video recorders ("DVRs") that allow consumers to record programming and view it later,

and VOD services that allow viewers to view broadcast or cable network programming or

movies on demand at times of their choosing.

#### 2. Online Video Programming Distributors ("OVDs")

33.    OVDs offer numerous choices for on-demand professional (as opposed to user-

generated, *e.g.*, typical YouTube videos), full-length (as opposed to clips) video programming

over the Internet, whether streamed to Internet-connected televisions or other devices, or

downloaded for later viewing.  Currently, OVDs employ several business models, including free

advertiser-supported streaming (*e.g.*, Hulu), á la carte downloads or electronic sell-through

("EST") (*e.g.*, Apple iTunes, Amazon), subscription streaming models (*e.g.*, Hulu Plus, Netflix), per-program rentals (*e.g.*, Apple iTunes, Vudu), and hybrid hardware/subscription models (*e.g.*, Tivo, Apple TV/iTunes).

34.     Consumer desire for on-demand viewing and increased broadband speeds that have greatly improved the quality of the viewing experience have led to distribution of more professional content by OVDs.  Online video viewing has grown enormously in the last several years and is expected to increase.  Today, some consumers regard OVDs as acceptable substitutes for at least a portion of their traditional video programming distribution services. These consumers buy smaller content packages from traditional distributors, decline to take certain premium channels, or purchase fewer VOD offerings, and instead watch that content online, a practice known as "cord-shaving."  A smaller but growing number of MVPD customers also are "cutting the cable cord" completely in favor of OVDs.  These trends indicate the growing significance of competition between OVDs and MVPDs.

35.     OVD services, individually or collectively, are likely to continue to develop into better substitutes for MVPD video services.  Evolving consumer demand, improving technology (*e.g.*, higher Internet access speeds, better compression to improve picture quality, improved digital rights management to fight piracy), and advertisers' increasing willingness to place their ads on the Internet, likely will make OVDs stronger competitors to MVPDs for greater numbers of existing and new viewers.

36.     Comcast and other MVPDs recognize the impact of OVDs.  Their documents consistently portray the emergence of OVDs as a significant competitive threat.  MVPDs, including Comcast, have responded by improving existing services and developing new, innovative services for their customers.  For example, MVPDs have improved user interfaces

and video search functionality, offered more VOD programming, and begun to offer programming online.

37.     GE, through its ownership of NBCU, is a content producer and an owner of broadcast and cable channels.  Comcast is primarily a distributor of video programming, although it owns some cable networks.  Through the proposed JV, Comcast will control assets that produce and aggregate some of the most significant video content.  Comcast also will continue to own the nation's largest distributor of video programming to residential customers.

## V.  RELEVANT MARKET

38.     The relevant product market affected by this transaction is the timely distribution of professional, full-length video programming to residential customers ("video programming distribution").  Both MVPDs and OVDs are participants in this market.  Video programming distribution is characterized by the aggregation of professionally produced content, consisting of entire episodes of shows and movies, rather than short clips.  This content includes live programming, sports, and general entertainment programming from a mixture of broadcast and cable networks, as well as from movie studios.  Video programming distributors typically offer various packages of content (*e.g.*, basic, expanded basic, digital), quality levels (*e.g.*, standard-definition, HD, 3D), and business models (*e.g.*, free ad-supported, subscription).  Video programming can be viewed immediately by consumers, whether on demand or as scheduled (*i.e.*, in a cable network's linear stream).

39.      A variety of companies distribute video programming – cable, DBS, overbuilder, telco, and online.  Cable has remained the dominant distributor even as other companies have entered video programming distribution.  In the mid-1990s, DirecTV and DISH Network began offering hundreds of channels using small satellite dishes.  Around the same time, firms known

as "overbuilders" began building their own wireline networks, primarily in urban areas, to

compete with the incumbent cable operator and offer video, high-speed Internet, and voice

telephony services – the "triple-play."  More recently, Verizon and AT&T entered the market

with their own networks and also offer the triple-play.  Competition from these video

programming distributors has provoked incumbent cable operators across the country to upgrade

their systems and thereby offer substantially more video programming channels, as well as the

triple-play.  Now, OVDs are introducing new and innovative business models and services to

inject even more competition into the video programming distribution market.

40.     Historically, over-the-air ("OTA") distribution of broadcast network content has

not served as a significant competitive constraint on MVPDs because of the limited number of

channels offered.  In addition, OTA distribution likely will not expand in the future, as no new

broadcast networks are likely to be licensed for distribution.  This diminishes the possibility that

OTA could increase its content package substantially to compete with MVPDs.  Thus, OTA is

unlikely to become a significant video programming distributor.  By contrast, OVDs, though

they may offer more limited viewing options than MVPDs currently, are expanding rapidly and

have the potential to provide increased and more innovative viewing options in the future.

41.     Consumers purchasing video programming distribution services select from

among those distributors that can offer such services directly to their home.  The DBS operators,

DirecTV and DISH, can reach almost any customer in the continental United States who has an

unobstructed line of sight to their satellites.  OVDs are available to any consumer with a high-

speed Internet service sufficient to receive video of an acceptable quality.  However, wireline

cable distributors such as Comcast and Verizon generally must obtain a franchise from local,

municipal, or state authorities in order to construct and operate a wireline network in a specific

area, and then build lines only to homes in that area.  A consumer cannot purchase video

programming distribution services from a wireline distributor operating outside its area because

that firm does not have the facilities to reach the consumer's home.  Thus, although the set of

video programming distributors able to offer service to individual consumers' residences

generally is the same within each local community, that set differs from one local community to

another and can vary even within a local community.

42.      For ease of analysis, it is useful to aggregate consumers who face the same

competitive choices in video programming distribution by, for example, aggregating customers

in a county or other jurisdiction served by the same group of distributors.  The United States thus

comprises numerous local geographic markets for video programming distribution, each

consisting of a community whose residents face the same competitive choices.  In the vast

majority of local markets, customers can choose from among the local cable incumbent and the

two DBS operators.  Approximately 38 percent of consumers can also buy video services from a

telco, and a much smaller percentage live in areas where overbuilders provide service.  OVDs

are emerging as another viable option for consumers who have access to high-speed Internet

services.  OVDs rely on other companies' high-speed Internet services to deliver content to

consumers.

43.      The geographic markets relevant to this transaction are the numerous local

markets throughout the United States where Comcast is the incumbent cable operator, covering

over 50 million U.S. television households (about 45 percent nationwide), and where Comcast

will be able to withhold NBCU programming from, or raise the programming costs to, its rival

distributors, both MVPDs and OVDs.  Because these competitors serve areas outside Comcast's

cable footprint, other local markets served by these rival distributors may be affected, with the competitive effects of the transaction potentially extending to all Americans.

44.     A hypothetical monopolist of video programming distribution in any of these geographic areas could profitably raise prices by a small but not insignificant, non-transitory amount.  While consumers naturally look for other options in response to higher prices, the number of consumers that would likely find these other options to be adequate substitutes is insufficient to make the higher prices unprofitable for the hypothetical monopolist.  Thus, video programming distribution in any of these geographic areas is a well-defined antitrust market and is susceptible to the exercise of market power.

## VI.  MARKET CONCENTRATION

45.     The incumbent cable companies often dominate any particular market with market shares within their franchise areas well above 50 percent.  For example, Comcast has the market shares of 64 percent in Philadelphia, 62 percent in Chicago, 60 percent in Miami, and 58 percent in San Francisco (based on MVPD subscribers).  Combined, the DBS providers account for approximately 31 percent of total video programming distribution subscribers nationwide, although their shares vary and may be lower in any particular local market.  AT&T and Verizon have had great success and achieved penetration (*i.e.*, the percentage of households to which a provider's service is available that actually buys its service) as high as 40 percent in the selected communities they have entered, although they currently have limited expansion plans.  Overbuilders serve only about one percent of U.S. television households nationwide.

46.     Today, OVDs have a *de minimis* share of the video programming distribution market in any geographic area.  OVD services are available to any consumer who purchases a broadband connection.  However, established distributors, such as Comcast, view OVDs as a

growing competitive threat and have taken steps to respond to that threat.  OVDs' current market shares, therefore, greatly understate both their future and current competitive significance in terms of the influence they are having on traditional video programming distributors' investment decisions to expand offerings and embrace Internet distribution themselves.

## VII.  ANTICOMPETITIVE EFFECTS

47.     Today, Comcast competes with DBS, overbuilder, and telco competitors by upgrading its existing services (*e.g.*, improving its network, expanding its VOD and HD offerings), and through promotional and other forms of price discounts.  In particular, Comcast strives to provide a service that it can promote as better than its rivals' services in terms of variety of programming choices, higher-quality services, and unique features (*e.g.*, unique programming or ease of use).   Consumers benefit from this competition by receiving better quality services and, in some cases, lower prices.  This competition has also fostered innovation, including the development of digital transmission, HD and 3D programming, and the introduction of DVRs and VOD offerings.

48.     The proposed JV would allow Comcast to limit competition from MVPD competitors and from the growing threat of OVDs.  The JV would give Comcast control over NBCU content that is important to its competitors.  Comcast has long recognized that by withholding certain content from competitors, it can gain additional cable subscribers and limit the growth of emerging competition.  Comcast has refused to license one of its RSNs, CSN Philadelphia, to DirecTV or DISH.  As a result, DirecTV's and DISH's market shares in Philadelphia are much lower than in other areas where they have access to RSN programming.

49.     Control of NBCU programming will give Comcast an even greater ability to disadvantage its competitors.  Carriage of NBCU programming, including the NBC broadcast

network, is important for video programming distributors to compete effectively.  Out of

hundreds of networks, the NBC broadcast network consistently is ranked among the top four in

consumer interest surveys.  It receives high Nielsen ratings, which distributors and advertisers

use as a proxy for a network's value.  The importance of the NBC broadcast network to a

distributor is underscored by the fact that NBCU has recently negotiated significant

retransmission fees with certain distributors that when combined with its advertising revenues,

rival the most valuable cable network programming.   Economic studies show that distributors

that lose important broadcast content for any significant period of time suffer substantial

customer losses to their competitors.

50.     NBCU's cable networks also are important to consumers and therefore to video

programming distributors.  USA Network has been the highest-rated cable network the past four

years.  CNBC is by far the highest-rated financial news cable network, and Bravo and SyFy are

top-rated cable networks for their particular demographics.  NBCU's cable networks are widely

distributed and command high fees.

51.     As a result of the JV, Comcast will gain control over the NBC O&Os in local

television markets where Comcast is the dominant video programming distributor.  The JV will

give Comcast the ability to raise the fees for retransmission consent for the NBC O&Os or

effectively deny this programming entirely to certain video programming distribution

competitors.  In addition, Comcast may be able to gain the right to negotiate on behalf of its

broadcast network affiliate stations or the ability to influence the affiliates' negotiations with its

distribution competitors.  In either case, these distributors would be less effective competitors to

Comcast.  Comcast also will control NBCU's cable networks and film content, increasing the

ability of the JV to obtain higher fees for that programming.  The JV will have less incentive to

distribute NBCU programming to Comcast's video distribution rivals than a stand-alone NBCU. Faced with weakened competition, Comcast can charge consumers more and will have less incentive to innovate.

52. The impact of the JV on emerging competition from the OVDs is extremely troubling given the nascent stage of OVDs' development and the potential of these distributors to significantly increase competition through the introduction of new and innovative features, packaging, pricing, and delivery methods. NBCU has been one of the content providers most willing to support OVDs and experiment with different methods of online distribution. It was a founding partner in Hulu, the largest OVD today, and prior to the announcement of the transaction entered into several contracts with OVDs, such as Apple iTunes, Amazon, and Netflix.

53. Comcast and other MVPDs have significant concerns over emerging competition by OVDs. To the extent that consumers, now or in the future, view OVDs as substitutes for traditional video programming distributors, they will be able to challenge Comcast's dominant position as a video programming distributor. Comcast has taken several steps to keep its customers from cord-shaving or cord-cutting in favor of OVDs. These efforts include launching its own online video portal (Fancast), improving its VOD library and online interactive interface (in order to compete with, *e.g.*, Netflix and Amazon), and deploying its "authenticated" online, on-demand service. Consumers have benefited from Comcast's competitive responses and, absent the JV, would benefit from increased competition from OVDs.

54. Comcast has an incentive to encumber, through its control of the JV, the development of nascent distribution technologies and the business models that underlie them by denying OVDs access to NBCU content or substantially increasing the cost of obtaining such

content.  As a result, Comcast will face less competitive pressure to innovate, and the future

evolution of OVDs will likely be muted.  Comcast's incentives and ability to raise the cost of or

deny NBCU programming to its distribution rivals, especially OVDs, will lessen competition in

video programming distribution.

## VIII.  ABSENCE OF COUNTERVAILING FACTORS

### A.  Entry

57.     Entry or expansion of traditional video programming distributors on a widespread

scale or entry of programming networks comparable to NBCU's will not be timely, likely, or

sufficient to reverse the competitive harm that would likely result from the proposed JV.  OVDs

are less likely to develop into significant competitors if denied access to NBCU content.

### B.  Efficiencies

56.     The proposed JV will not generate verifiable, merger-specific efficiencies

sufficient to reverse the competitive harm of the proposed JV.

## IX.  VIOLATIONS ALLEGED

### Violation of Section 7 of the Clayton Act By Each Defendant

57.     The United States and the Plaintiff States hereby incorporate paragraphs 1

through 56.

58.     Pursuant to a Master Agreement dated December 3, 2009, Comcast, GE, and

NBCU intend to form a joint venture.

59.     The effect of the proposed JV and Comcast's acquisition of 51 percent of it would

be to lessen competition substantially in interstate trade and commerce in numerous geographic

markets for video programming distribution, in violation of Section 7 of the Clayton Act,

15 U.S.C. § 18, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

60.     This proposed JV threatens loss or damage to the general welfare and economies of each of the Plaintiff States, and to the citizens of each of the Plaintiff States.  The Plaintiff States and their citizens will be subject to a continuing and substantial threat of irreparable injury to the general welfare and economy, and to competition, in their respective jurisdictions unless the Defendants are enjoined from carrying out this transaction, or from entering into or carrying out any agreement, understanding, or plan by which Comcast would acquire control over NBCU or any of its assets.

61.     The proposed JV will likely have the following effects, among others:

a.      competition in the development, provision, and sale of video programming distribution services in each of the relevant geographic markets will likely be eliminated or substantially lessened;

b.      prices for video programming distribution services will likely increase to levels above those that would prevail absent the JV; and

c.      innovation and quality of video programming distribution services will likely decrease to levels below those that would prevail absent the JV.

## X.  REQUESTED RELIEF

62.     The United States and the Plaintiff States request that:

a.      the proposed JV be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

b.      Comcast, GE, NBCU, and Newco be permanently enjoined from carrying out the proposed JV and related transactions; carrying out any other agreement, understanding, or plan by which Comcast would acquire control over NBCU or any of its assets; or merging;

c.      the United States and the Plaintiff States be awarded their costs of this

        action;

d.      the Plaintiff States be awarded their reasonable attorneys' fees; and

e.      the United States and the Plaintiff States receive such other and further

        relief as the case requires and the Court deems just and proper.

Dated: January 18, 2011

Respectfully submitted,

FOR PLAINTIFF UNITED STATES:

_____/s/_____
CHRISTINE A. VARNEY (DC Bar #411654)
Assistant Attorney General for Antitrust


_____/s/_____
MOLLY S. BOAST
Deputy Assistant Attorney General


_____/s/_____
GENE I. KIMMELMAN (DC Bar #358534)
Chief Counsel for Competition Policy and
   Intergovernmental Relations


_____/s/_____
PATRICIA A. BRINK
Director of Civil Enforcement


_____/s/_____
JOSEPH J. MATELIS (DC Bar #462199)
Counsel to the Assistant Attorney General


_____/s/_____
NANCY M. GOODMAN
Chief
LAURY E. BOBBISH
Assistant Chief
Telecommunications & Media Enforcement


_____/s/_____
JOHN R. READ (DC Bar #419373)
Chief
DAVID C. KULLY (DC Bar #448763)
Assistant Chief
Litigation III

_____/s/_____
YVETTE F. TARLOV*  (DC Bar #442452)
Attorney
Telecommunications & Media Enforcement
Antitrust Division
U.S. Department of Justice
450 Fifth Street, N.W., Suite 7000
Washington, DC  20530
Telephone: (202) 514-5621
Facsimile: (202) 514-6381
E-mail: Yvette.Tarlov@usdoj.gov

MATTHEW J. BESTER (DC Bar #465374)
SHOBITHA BHAT
HILLARY B. BURCHUK (DC Bar #366755)
LUIN P. FITCH
PAUL T. GALLAGHER (DC Bar #439701)
PETER A. GRAY
F. PATRICK HALLAGAN
MICHAEL K. HAMMAKER (DC Bar #233684)
MATTHEW C. HAMMOND
JOYCE B. HUNDLEY
ROBERT A. LEPORE
ERICA S. MINTZER (DC Bar #450997)
H. JOSEPH PINTO III
WARREN A. ROSBOROUGH IV (DC Bar #495063)
NATALIE ROSENFELT
BLAKE W. RUSHFORTH
ANTHONY D. SCICCHITANO
JENNIFER A. WAMSLEY (DC Bar #486540)
FREDERICK S. YOUNG (DC Bar #421285)
Attorneys for the United States


*Attorney of Record

**FOR PLAINTIFF STATE OF CALIFORNIA**

KAMALA D. HARRIS
Attorney General


_____/s/_____
Jonathan M. Eisenberg
Deputy Attorney General
California Department of Justice
Office of the Attorney General
CSB No. 184162
300 South Spring Street, Suite 1702
Los Angeles, California 90013
Phone:  (213) 897-6505
Facsimile: (213) 620-6005
jonathan.eisenberg@doj.ca.gov

**FOR PLAINTIFF STATE OF FLORIDA**

PAMELA JO BONDI
Attorney General
State of Florida


_____/s/_____
PATRICIA A. CONNERS
Associate Deputy Attorney General
ELI A. FRIEDMAN
Assistant Attorney General
LIZABETH A. BRADY
Chief, Multistate Antitrust Enforcement
ANTITRUST DIVISION
PL-01, The Capitol
Tallahassee, FL 32399-1050
Tel: (850) 414-3300
Fax: (850)488-9134
Email: Eli.Friedman@myfloridalegal.com

**FOR PLAINTIFF STATE OF MISSOURI**


_____/s/_____
CHRIS KOSTER
Attorney General

ANNE E. SCHNEIDER
Assistant Attorney General / Antitrust Counsel
ANDREW M. HARTNETT
Assistant Attorney General

P.O. Box 899
Jefferson City, MO  65109
573/751-7445
F: 573/751-2041
anne.schneider@ago.mo.gov

**FOR PLAINTIFF STATE OF TEXAS**

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

BILL COBB
Deputy Attorney General for Civil Litigation


_____/s/_____
John T. Prud'homme, Jr.
Chief, Antitrust Division
Office of the Attorney General
300 W. 15th St., 7th floor
Austin, Texas  78701
(512) 936-1697
(512) 320-0975 - facsimile

**FOR PLAINTIFF STATE OF WASHINGTON**


_____/s/_____
David M. Kerwin
Assistant Attorney General
Antitrust Division
Office of the Attorney General of Washington
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206/464-7030
davidk3@atg.wa.gov