## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF FLORIDA, STATE OF MISSOURI, STATE OF TEXAS, and STATE OF WASHINGTON, <br><br> *Plaintiffs,* <br><br> v. <br><br> COMCAST CORP., GENERAL ELECTRIC CO., and NBC UNIVERSAL, INC., <br><br> *Defendants.* | Civil Action No.: |

## COMPETITIVE IMPACT STATEMENT

The United States of America ("United States"), acting under the direction of the Attorney General of the United States, pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment (attached hereto as Exhibit A) submitted for entry in this civil antitrust proceeding.

## I.  NATURE AND PURPOSE OF THE PROCEEDING

On December 3, 2009, Comcast Corporation ("Comcast"), General Electric Company ("GE"), NBC Universal, Inc. ("NBCU"), and Navy, LLC ("Newco"), announced plans to form a new Joint Venture ("JV") to which Comcast and GE will contribute broadcast and cable network assets.  As a result of the transaction, Comcast – the nation's largest cable company – will have majority control of a JV holding highly valued video programming needed by Comcast's video distribution rivals to compete effectively.

The United States filed a civil antitrust Complaint on January 18, 2011, seeking to enjoin the proposed transaction because its likely effect would be to lessen competition substantially in the market for timely distribution of professional, full-length video programming to residential customers ("video programming distribution") in major portions of the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  The transaction would allow Comcast to disadvantage its traditional competitors (direct broadcast satellite ("DBS") and telephone companies ("telcos") that provide video services), as well as competing emerging online video distributors ("OVDs").  This loss of current and future competition likely would result in lower-quality services, fewer choices, and higher prices for consumers, as well as reduced investment and less innovation in this dynamic industry.

On January 18, 2011, the Federal Communications Commission ("FCC") adopted a Memorandum Opinion and Order relating to the foregoing transaction.[1]  The FCC's Order approved the transaction subject to certain conditions.

Under the proposed Final Judgment filed by the United States Department of Justice simultaneously with this Competitive Impact Statement and explained more fully below, Defendants will be required, among other things, to license the JV's programming to Comcast's emerging OVD competitors in certain circumstances.  When Defendants and OVDs cannot reach agreement on the terms and conditions of the license, the aggrieved OVD may apply to the Department for permission to submit its dispute to commercial arbitration under the proposed Final Judgment.  The FCC Order contains a similar provision.  For so long as commercial arbitration is available for the resolution of such disputes in a timely manner under the FCC's

---

[1] Memorandum Opinion and Order, *In re Applications of Comcast Corp., General Electric Co. and NBC Universal, Inc. for Consent to Assign Licenses and Transfer Control of Licensees,* FCC MB Docket No. 10-56 (adopted Jan. 18, 2011).  Under the Communications Act, the FCC has jurisdiction to determine whether mergers involving the transfer of a telecommunications license are in the "public interest, convenience, and necessity."  47 U.S.C. § 310(d).

rules and orders, the Department will ordinarily defer to the FCC's commercial arbitration process to resolve such disputes.  However, the Department reserves the right, in its sole discretion, to permit arbitration under the proposed Final Judgment to advance the Final Judgment's competitive objectives.  In addition, the Department may seek relief from the Court to address violations of any provisions of the proposed Final Judgment.  The proposed Final Judgment also contains provisions to prevent Defendants from interfering with an OVD's ability to obtain content or deliver its services over the Internet.

The proposed Final Judgment will provide a prompt, certain, and effective remedy for consumers by diminishing Comcast's ability to use the JV's programming to harm competition. The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA.  Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment, and to punish and remedy violations thereof.

## II.  DESCRIPTION OF EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A.  <u>Defendants, the Proposed Transaction, and the Department's Investigation</u>

#### 1.  Comcast

Comcast is a Pennsylvania corporation headquartered in Philadelphia, Pennsylvania.  It is the largest cable company in the nation, with approximately 23 million video subscribers. Comcast is also the largest Internet service provider ("ISP"), with over 16 million subscribers. Comcast also wholly owns national cable programming networks, including E! Entertainment, G4, Golf, Style, and Versus, and has partial ownership interests in Current Media, MLB Network, NHL Network, PBS KIDS Sprout, Retirement Living Television, and TV One.  In

addition, Comcast has controlling and partial interests in regional sports networks ("RSNs").[2] Comcast also owns digital properties such as DailyCandy.com, Fandango.com, and Fancast, its online video website. In 2009, Comcast reported total revenues of $36 billion. Over 94 percent of Comcast's revenues, or $34 billion, were derived from its cable business, including $19 billion from video services, $8 billion from high-speed Internet services, and $1.4 billion from local advertising on Comcast's cable systems. In contrast, Comcast's cable programming networks earned only about $1.5 billion in revenues from advertising and fees collected from video programming distributors.

### 2. GE and NBCU

GE is a New York corporation with its principal place of business in Fairfield, Connecticut. GE is a global infrastructure, finance, and media company. GE owns 88 percent of NBCU, a Delaware corporation, headquartered in New York, New York. NBCU is principally involved in the production, packaging, and marketing of news, sports, and entertainment programming.

NBCU wholly owns the NBC and Telemundo broadcast networks, as well as ten local NBC owned and operated television stations ("O&Os"), 16 Telemundo O&Os, and one independent Spanish language television station. In addition, NBCU wholly owns national cable programming networks – Bravo, Chiller, CNBC, CNBC World, MSNBC, mun2, Oxygen, Sleuth, SyFy, and USA Network – and partially owns A&E Television Networks (including the Biography, History, and Lifetime cable networks), The Weather Channel, and ShopNBC.

NBCU also owns Universal Pictures, Focus Films, and Universal Studios, which produce films for theatrical and digital video disk ("DVD") release, as well as content for NBCU's and

---

[2] Comcast owns Comcast SportsNet ("CSN") Bay Area, CSN California, CSN Mid-Atlantic, CSN New England, CSN Northwest, CSN Philadelphia, CSN Southeast, and CSN Southwest, and holds partial ownership interests in CSN Chicago, SportsNet New York, and The Mtn.

other companies' broadcast and cable programming networks.  NBCU produces approximately three-quarters of the original primetime programming shown on the NBC broadcast network and the USA cable network, NBCU's two highest-rated networks.  In addition to its programming assets, NBCU owns several theme parks and digital assets, such as iVillage.com.  In 2009, NBCU had total revenues of $15.4 billion.

NBCU also is a founding partner and 32 percent owner of Hulu, LLC, currently one of the most successful OVDs.  Hulu is a joint venture between NBCU, News Corp., The Walt Disney Company, and a private equity investor.  Each of the media partners has representation on the Hulu Board, possesses management rights, and licenses content for Hulu to deliver over the Internet.

### 3.     The Proposed Transaction

On December 3, 2009, Comcast, GE, NBCU, and Newco, entered into a Master Agreement ("Agreement"), whereby Comcast agreed to pay $6.5 billion in cash to GE, and Comcast and GE each agreed to contribute certain assets to the JV.  Specifically, GE agreed to contribute all of the assets of NBCU, including its interest in Hulu, and the 12 percent interest in NBCU that GE does not own but has agreed to purchase from Vivendi SA.  Comcast agreed to contribute all its cable programming assets, including its national programming networks, its RSNs, and some digital properties, but not its cable systems or its Internet video service, Fancast.  As a result of the content contributions and cash payment by Comcast, Comcast will own 51 percent of the JV, and GE will retain a 49 percent interest.  The JV will be managed by a separate Board of Directors consisting initially of three Comcast-designated directors and two GE-designated directors.  Board decisions will be made by majority vote.

The Agreement precludes Comcast from transferring its interest in the JV for a four-year period, and prohibits GE from transferring its interest for three and one-half years.  Thereafter, either party may sell its respective interest in the JV, subject to Comcast's right to purchase at fair market value any interest that GE proposes to sell.  Additionally, three and one-half years after closing, GE will have the right to require the JV to redeem 50 percent of GE's interest and, after seven years, GE will have the right to require the JV to redeem all of its remaining interest. If GE elects to exercise its first right of redemption, Comcast will have the contemporaneous right to purchase the remainder of GE's ownership interest once a purchase price is determined. If GE does not exercise its first redemption right, Comcast will have the right to buy 50 percent of GE's initial ownership interest five years after closing and all of GE's remaining ownership interest eight years after closing.  It is expected that Comcast ultimately will own 100 percent of the JV.

### 4.        The Department's Investigation

The Department opened an investigation soon after the JV was announced and conducted a thorough and comprehensive review of the video programming distribution industry and the potential implications of the transaction.  The Department interviewed more than 125 companies and individuals involved in the industry, obtained testimony from Defendants' officers, required Defendants to provide the Department with responses to numerous questions, reviewed over one million business documents from Defendants' officers and employees, obtained and reviewed tens of thousands of third-party documents, obtained and extensively analyzed large volumes of industry financial and economic data, consulted with industry and economic experts, organized product demonstrations, and conducted independent industry research.  The Department also consulted extensively with the FCC to ensure that the agencies conducted their reviews in a

coordinated and complementary fashion and created remedies that were both comprehensive and consistent.

**B.      The Video Programming Industry**

NBCU and Comcast are participants in the video programming industry, in which content is produced and distributed to viewers through their television sets or, increasingly, through Internet-connected devices.  Historically, the video programming industry has had three different levels:  content production, content aggregation or networks, and distribution.

**1.      Content Production**

Television production studios produce television shows and coordinate how, when, and where their content is licensed in order to maximize revenues.  They usually license to broadcast and cable networks the right to show a program first (*i.e.*, the first-run rights).  Content producers also license their content for subsequent "windows" such as syndication (*e.g.*, licensing series to broadcast and cable networks after the first run of the programming), as well as for DVD distribution, video on demand ("VOD"), and pay per view ("PPV") services.  For example, the television show *House* is produced by NBCU, licensed for its first run on the FOX broadcast network and then rerun on the USA Network, a cable network owned by NBCU.  These content licenses often include ancillary rights such as the right to offer some programming on demand.

Historically, first-run licenses were reserved for one of the four major broadcast networks (ABC, CBS, NBC, and FOX), followed by broadcast syndication and, ultimately, cable syndication.  Over the past several years, however, content owners have begun to license their content for first run on cable networks and distribution over the Internet on either a catch-up (*e.g.*, next day) or syndicated (*e.g.*, next season) basis.

In addition to producing content for television and cable networks, NBCU produces and distributes first-run movies through Universal Pictures, Universal Studios, and Focus Films. Typically, producers distribute movies to theaters before releasing them on DVD, then license them to VOD/PPV providers, then to premium cable channels (*e.g.*, Home Box Office ("HBO")), then to regular cable channels, and finally to broadcast networks.  As with television distribution, studios have experimented with different windows for film distribution over the past several years.

### 2.  Programming Networks

Networks aggregate content to provide a 24-hour service that is attractive to consumers. The most popular networks, by far, are the four broadcast networks.[3]  However, cable networks have grown in popularity and number, and at the end of 2009 there were an estimated 600 national, plus another 100 regional, cable programming networks.

### a.  Broadcast Networks

Owners of broadcast network programming or broadcasters like NBCU license their broadcast networks either to third-party television stations affiliated with that network ("network affiliates"), or to their owned and operated television stations ("O&Os").  The network affiliates and O&Os distribute the broadcast network feeds over the air ("OTA") to the public and also retransmit them to video programming distributors, such as cable companies and DBS providers, which in turn distribute the feeds to their subscribers.

Under the Cable Television Consumer Protection and Competition Act of 1992 ("1992 Cable Act"), Pub. L. No. 102-385, 106 Stat. 1460 (1992), broadcast television stations, whether

---

[3] The four largest broadcast networks attract 8 to 12 million viewers each, whereas the most popular cable networks typically attract approximately 2 million viewers each.  SNL Kagan, *Economics of Basic Cable Networks* 43 (2009); The Nielsen Company, *Snapshot of Television Use in the U.S.* 2 (Sept. 2010), http://blog.nielsen.com/nielsenwire/wp-content/uploads/ 2010/09/Nielsen-State-of-TV-09232010.pdf.

network affiliates or O&Os, may elect to obtain "retransmission consent" from a programming distributor, in which case a distributor negotiates with a station for the right to carry the station's programming for agreed-upon terms.  Alternatively, stations may elect "must carry" status and demand carriage but without compensation.  Stations affiliated with the four major broadcast networks and the networks' O&Os have elected retransmission consent.  Historically, these stations negotiated for non-monetary compensation (*e.g.*, carriage of new cable channels owned by the broadcaster) in exchange for retransmission consent.  Today, most broadcast stations seek retransmission consent fees based on the number of subscribers to the cable, DBS, or telco service distributing their content.[4]  Less popular broadcast networks generally elect must carry status, although recently they also have begun to negotiate retransmission payments.  Despite these retransmission payments, broadcast stations earn the majority of their revenues from local advertising sales.  The broadcast networks earn most of their revenues from national advertising sales.

> b.  *Cable Networks*

Popular cable networks include ESPN, USA, MTV, CNN, and Bravo.  Cable networks typically derive roughly one half of their revenues from licensing fees paid by video programming distributors and the other half from advertising fees.  Generally, a distributor pays an owner of cable networks a monthly per-subscriber fee that may vary based upon the number of subscribers served by the distributor, the programming packages in which the program is included, the percentage of the distributor's subscribers receiving the programming, and other factors.  Typically, the popularity or ratings of a network's programming affects the ability of a

---

[4] In the past, NBCU negotiated the retransmission rights only for its O&Os, but recently it has made efforts to obtain the rights from its network affiliates to negotiate retransmission consent agreements on their behalf.  NBCU also may seek to renegotiate its agreements with its affiliates to obtain a share of any retransmission consent fees the affiliates are able to command.

content owner to negotiate higher license fees. In addition to the right to carry the network, a distributor of the cable network often receives two to three minutes of advertising time per hour on the network for sale to local businesses (*e.g.*, car dealers). A distributor also may receive marketing payments or discounts to encourage wider distribution of the programming. In the case of a completely new cable network, a programmer may pay a distributor to carry the network or offer other discounts.

### 3.      Video Programming Distribution

Video programming distributors acquire the rights to transmit professional (as opposed to user-generated videos such as those typically seen on YouTube), full-length (as opposed to clips) broadcast and cable programming networks or individual programs or movies, aggregate the content, and distribute it to their subscribers or users. This content includes live programming, sports, and general entertainment programming from a variety of broadcast and cable networks and from movie studios, and can be viewed either on demand or as scheduled in a broadcast or cable network's linear stream. Video programming distributors offer various packages of content (*e.g.*, basic, expanded basic, digital) with different quality levels (*e.g.*, standard definition, HD, 3D), and employ different business models (*e.g.*, ad-supported, subscription).

#### a.      *Multichannel Video Programming Distributors*

Traditional video programming distributors include incumbent cable companies, DBS providers, cable overbuilders, also known as broadband service providers ("BSPs," such as RCN), and telcos. These distributors are referred to as multichannel video programming distributors ("MVPDs"), and typically offer hundreds of channels of professional video programming to residential customers for a fee.

### b.    Online Video Programming Distributors

OVDs are relatively recent entrants into the video programming distribution market. They deliver a variety of on-demand professional, full-length video programming over the Internet, whether streamed to Internet-connected televisions or other devices, or downloaded for later viewing.  Hulu, Netflix, Amazon, and Apple are examples of OVDs, although the content delivered and business model used varies greatly among them.

Unlike MVPDs, OVDs do not own distribution facilities and are dependent upon ISPs for the delivery of their content to viewers.  Therefore, the future growth of OVDs depends, in part, on how quickly ISPs expand and upgrade their broadband facilities and the preservation of their incentives to innovate and invest.[5]  The higher the bandwidth available from the ISP, the greater the speed and the better the quality of the picture delivered to an OVD's users.

ISPs' management and pricing of broadband services may also affect OVDs.  In particular, OVDs would be harmed competitively if ISPs that are also MVPDs (*e.g.*, cable companies, telcos) were to impair or delay the delivery of video because OVDs pose a threat to those MVPDs' traditional video programming distribution businesses.  Because Comcast is the country's largest ISP, an inherent conflict exists between Comcast's provision of broadband services to its customers, who may use this service to view video programming provided by OVDs, and its desire to continue to sell them MVPD services.

Growth of OVDs also will depend, in part, on their ability to acquire programming from content producers.  Some cable companies, such as Comcast and Cablevision Corp., have purchased or launched their own cable networks.  This vertical integration of content and distribution was one reason for the passage of Section 19 of the 1992 Cable Act, 47 U.S.C. § 548.  Pursuant to the Act, Congress directed the FCC to promulgate rules that place restrictions

---

[5] *See* discussion *infra* Section II.C.2.b.

on how cable programmers affiliated with a cable company deal with unaffiliated distributors. These "program access rules" were designed to prevent vertically integrated cable companies from refusing to provide popular programming to their competitors.  The rules prohibit both the cable company and a cable network owned by it from engaging in unfair acts and practices, including:  (1) entering into exclusive agreements to distribute the cable network; (2) selling the cable network to the cable company's competitors on discriminatory terms and conditions; and (3) unduly influencing the cable network in deciding to whom, and on what terms and conditions, to sell its programming.[6]  The FCC program access rules do not apply to online distribution or to retransmission of broadcast station content.

C.     **The Market for Video Programming Distribution in the United States**

The relevant product market affected by this transaction is the market for timely distribution of professional, full-length video programming to residential customers ("video programming distribution").  Professionally produced content is video programming that is created or produced by media and entertainment companies using professional equipment, talent, and production crews, and for which those companies hold or maintain distribution and syndication rights.  Video programming distribution is characterized by the aggregation of professionally produced content consisting of entire episodes of shows and movies, rather than short clips.  The market for video programming distribution includes both MVPDs and OVDs.

1.     **Traditional Video Programming Distribution**

Cable companies first began operating in the 1940s and initially were granted exclusive franchises to serve local communities.  Although they now face competition, the incumbent cable companies continue to serve a dominant share of subscribers in most areas.  In the mid-

---

[6] 47 C.F.R. §§ 76.1001-76.1002.  The prohibition on exclusivity sunsets in October 2012, unless extended by the FCC pursuant to a rulemaking.  *Id.* § 76.1002 (c)(6).

1990s, DirecTV and DISH Network began to offer competing services using small satellite dishes installed on consumers' homes.  Around the same time, cable overbuilders began building their own wireline networks in order to compete with the incumbent cable operator and offer video, high-speed Internet, and telephony services – the "triple-play."  More recently, Verizon and AT&T entered the market with their own video distribution services, also offering the triple-play.  Competition from these video programming distributors encouraged incumbent cable operators across the country to upgrade their systems and offer many more video programming channels, as well as the triple-play.  Further innovations have included digital video recorders ("DVRs") that allow consumers to record programming and view it later, and VOD services that enable viewers to watch broadcast or cable network programming or movies on demand at the consumer's convenience for a limited time.

A consumer purchasing video programming distribution services selects from those distributors offering such services directly to that consumer's home.  The DBS operators – DirecTV and DISH – can reach almost any consumer who lives in the continental United States and has an unobstructed line of sight to the DBS operators' satellites.  However, wireline cable distributors, such as Comcast and Verizon, generally must obtain a franchise from local or state authorities to construct and operate a wireline network in a specific area, and can build lines only to the homes in that area.  A consumer cannot purchase video programming distribution services from a wireline distributor operating outside its area because that firm does not have the facilities to reach the consumer's home.  Consequently, although the set of video programming distributors able to offer service to individual consumers' residences generally is the same within each local community, that set differs from one local community to another and can even vary within a local community.  The markets for video programming distribution therefore are local.

The geographic markets relevant to this transaction are the numerous local markets throughout the United States where Comcast is the incumbent cable operator and where Comcast through the JV will be able to withhold NBCU programming from, or raise programming costs to, Comcast's rival distributors. Comcast service areas cover 50 million U.S. television households or about 45 percent of households nationwide, with nearly half of those households (23 million) subscribing to at least one Comcast service. Competitive effects also may be felt in other areas because Comcast's competitors serve territories outside its cable footprint. If Comcast can disadvantage these rivals, for example by raising their costs, competition will be reduced everywhere these competitors provide service reflecting these higher costs. Thus, the potential anticompetitive effects of the transaction could extend to almost all Americans.

The incumbent cable companies often dominate any particular market and typically hold well over 50 percent market shares within their franchise areas. For example, Comcast has market shares of 64 percent in Philadelphia, 62 percent in Chicago, 60 percent in Miami, and 58 percent in San Francisco (based on MVPD subscribers). Combined, the DBS providers account for approximately 31 percent of video programming subscribers nationwide, although their shares vary and may be lower in any particular local market. Although AT&T and Verizon have had great success and achieved penetration (*i.e.*, the percentage of households to which a provider's service is available that actually buys its service) as high as 40 percent in the selected communities they have entered, they currently have limited expansion plans. Overbuilders serve an even smaller portion of the United States.

## 2. Competition from OVDs

OVDs are relatively recent entrants into the video programming distribution market. Their services are available to any consumer with high-speed Internet service sufficient to

receive video of an acceptable quality.  OVDs have increased substantially the amount of full-length professional content they distribute online.  Viewership of video content distributed over the Internet has grown enormously and is expected to continue to grow.  The number of adult Internet users who watch full-length television shows online is expected to increase from 41.1 million in 2008 to 72.2 million in 2011.[7]  The total number of unique U.S. viewers of video who watch full-length television shows online grew 21 percent from 2008 to 2009.[8]  OVD revenues also have increased dramatically.  Revenue associated with video content delivered over the Internet to televisions is expected to grow from $2 billion in 2009 to over $17 billion in 2014.[9]

One reason for the dramatic growth of online distribution is the increased consumer interest in on-demand viewing, especially among younger viewers who have grown up with the Internet, and are accustomed to viewing video at a time and on a device of their choosing.[10]  In response to competition by OVDs, MVPDs increasingly are offering more on-demand choices.

a.      *OVD Business Models and Participants*

Recognizing the enormous potential of OVDs, dozens of companies are innovating and experimenting with products and services that either distribute online video programming or facilitate such distribution.  New developments, products, and models are announced on almost a

---

[7] *Reaching Online Video Viewers with Long-Form Content*, eMarketer.com (July 26, 2010), http://www3.emarketer.com/Article.aspx?R=1007830.

[8] *Id.*

[9] Robert Briel, *Faster growth for web-to-TV video*, Broadband TV News (Aug. 17, 2010), http://www.broadbandtvnews.com/2010/08/17/faster-growth-for-web-to-tv-video.

[10] *See* R. Thomas Umstead, *Younger Viewers Watching More TV on the Web*, Multichannel News  (Apr. 12, 2010), http://www.multichannel.com/article/451376-Younger_Viewers_ Watching_More_Television_On_The_Web.php (survey of more than 1,000 people shows 23 percent under the age of 25 watch most of their television online).

daily basis by companies seeking to satisfy consumer demand.  A number of companies are committing significant resources to this industry.

OVDs provide content using a variety of different business models.  Some offer content on an ad-supported basis pursuant to which consumers pay nothing.  One firm using this model is Hulu, which aggregates primarily current-season broadcast content from NBC, FOX, ABC, and others.  Hulu has experienced substantial growth since its launch in 2008, reaching 39 million unique viewers by February 2010.[11]

Netflix has pursued a different business model.  It initially offered DVDs delivered by mail and then added unlimited streaming of a limited library of content over the Internet for a monthly subscription fee.  Netflix has expanded its online library and introduced an Internet-only subscription service.  Netflix content primarily consists of relatively recent movies, older movies, and past-season television shows.  Netflix recently announced a deal with premium cable network EPIX for access to more movie content that it will distribute over the Internet.[12] Netflix also has grown substantially in the last several years, from 7.5 million subscribers at the end of 2007 to 16.9 million in the third quarter of 2010.[13]

---

[11] Press Release, *comScore Releases February 2010 U.S. Online Video Rankings, Hulu Viewer Engagement Up 120 percent vs. Year Ago to 2.4 Hours of Video per Viewer in February* (Apr. 13, 2010), http://www.comscore.com/Press_Events/Press_Releases/2010/4/comScore_ Releases_February_2010_U.S._Online_Video_Rankings.

[12] Netflix, Inc., Q3 10 Management's commentary and financial highlights, at 2 (Oct. 20, 2010), *available at* http://files.shareholder.com/downloads/NFLX/1118542273x0x411049/157a4bc4-4cad-4d7b-9496-b59006d73344/Q310%20Management%27s%20commentary%20and%20 financial%20highlights.pdf.

[13] Netflix, Inc., Form 10-K at 32 (Feb. 22, 2010); Press Release, Netflix, Inc. Netflix Announces Q3 2010 Financial Results, at 1 (Oct 20, 2010), *available at* http://files.shareholder.com/ downloads/NFLX/1118542273x0x411037/5a757dd5-b423-40d7-bb60-3418356e582e/ 3Q10_Earnings_Release.pdf.

Apple also is experimenting with different business models for video programming distribution.  For several years it has offered content on an electronic sell-through ("EST") basis through its Apple iTunes Store.  Customers pay a per-transaction fee to buy television shows and movies and download them onto various electronic devices (*e.g.*, iPod).  Apple recently announced a service that allows consumers to rent television content on a per-transaction basis (*e.g.*, $0.99 per show) and view it for a limited time.  Other major companies are offering or planning to offer OVD services.[14]

> b.      *The Impact of OVDs*

Some of these OVD products and services undoubtedly will be viewed by consumers as closer substitutes for MVPD services than others.  The extent to which an OVD service has the potential to become a better substitute for MVPD service will depend on a number of factors, such as the OVD's ability to obtain popular content, its ability to protect the licensed content from piracy, its financial strength, and its technical capabilities to deliver high-quality content. Moreover, as noted previously, OVDs' future competitive significance depends, in part, on robust broadband capacity.  Accordingly, the competitive significance of OVDs is fostered by

---

[14] For example, Google recently launched GoogleTV, a device that enables viewers simultaneously to search the Internet and their MVPD service for content, and to switch back and forth on their televisions between content delivered over the Internet and content delivered by their MVPD.  Press Release, Google, *Industry Leaders Announce Open Platform to Bring Web to TV* (May 20, 2010), http://www.google.com/intl/en/press/pressrel/20100520_googletv.html. Walmart recently acquired VUDU, an OVD service, and is making content available for EST and rental to VUDU-enabled devices.  Press Release, *Walmart Announces Acquisition of Digital Entertainment Provider, VUDU* (Feb. 22, 2010), http://www.walmartstores.com/pressroom/ news/9661.aspx.  Amazon is reportedly developing an OVD service that allows Amazon service subscribers to stream television and movie content over the Internet.  Nick Wingfield & Sam Schechner, *No Longer Tiny, Netflix Gets Respect–and Creates Fear*, Wall St. J. (Dec. 6, 2010), http://online.wsj.com/article/SB10001424052748704493004576001781352962132.html.  Sears and Kmart recently announced the launch of an online video store, called Alphaline, which sells and rents movies and television shows.  Paul Bond, *Sears, Kmart launch Alphaline online video store*, REUTERS (Dec. 30, 2010), http://www.reuters.com/article/idUSTRE6BT03C20101230.

protecting broadband providers' economic incentives to upgrade and improve their broadband infrastructure, and obtain fair returns on that investment.

Today, some consumers regard OVDs as acceptable substitutes for at least a portion of their traditional video programming distribution services.  These consumers buy smaller content packages from traditional distributors, decline to take certain premium channels, or purchase fewer VOD offerings, and instead watch that content online, a practice known as "cord-shaving." A small but growing number of MVPD customers are also "cutting the cable cord" completely in favor of OVDs.  These customers may rely on an individual OVD or may view video content from a number of OVDs (*e.g.*, Hulu ad-supported service, Netflix subscription service, Apple EST service) as a replacement for their MVPD service.

When measured by the number of customers who are cord-shaving or cord-cutting, OVDs currently have a *de minimis* share of the video programming distribution market.  Their current market share, however, greatly understates their potential competitive significance in this market.  Whether viewers buy individual or a combination of OVD services, OVDs are likely to continue to develop into better substitutes for MVPD video services.  Evolving consumer demand, improving technology (*e.g.*, higher Internet access speeds, better compression technologies to improve picture quality, improved digital rights management to combat piracy), the increased choice of viewing devices, and advertisers' increasing willingness to place their ads on the Internet likely will make OVDs stronger competitors to MVPDs for an increasing number of viewers.[15]

---

[15] Historically, OTA distribution of broadcast network content has not served as a significant competitive constraint on MVPDs because of the limited number of channels offered.  In addition, OTA distribution likely will not expand in the future because no new broadcast networks are likely to be licensed for distribution.  Thus, OTA is unlikely to become a more significant video programming distributor.  By contrast, OVDs are expanding rapidly and have the potential to provide increased and more innovative viewing options in the future.

The development of the video programming distribution market – and in particular the success of OVDs – may influence any future analysis of consolidation in this market. Such analysis would follow standard merger evaluation principles and consider not only the role of OVDs, but also factors such as the extent to which the merging firms' offerings are close substitutes and compete directly. In this case, Defendants' own assessments – as reflected in numerous internal documents and their executives' testimony – of the importance of OVDs and their potential to alter dramatically the existing competitive landscape are particularly important to determining the relevant product market.

       *c.*      *Comcast's and Other MVPDs' Reactions to the Growth of OVDs*

Comcast and other MVPDs recognize the threat posed to their video distribution business from the growth of OVDs. Many internal documents reflect Comcast's assessment that OVDs are growing quickly and pose a competitive threat to traditional forms of video programming distribution. In response to this threat, Comcast has taken significant steps to improve the quality of Fancast, its own Internet video service. Among other things, Comcast has attempted to obtain additional – and at times exclusive – content from programmers, and has made Fancast's user interface easier to navigate. Comcast also has increased the quality and quantity of the VOD content it offers as an adjunct to its traditional cable service.

In addition, Comcast has created and implemented an "authentication" system that enables its existing cable subscribers to view some video content over the Internet if the subscriber already pays for and receives the same content from Comcast through its traditional cable service. Internal documents expressly acknowledge that "authentication" is Comcast's and other MVPDs' attempt to counter the perceived threat posed by OVDs.

19

Comcast's and other MVPDs' reactions to the emergence of OVDs demonstrate that they view OVDs as a future competitive threat and are adjusting their investment decisions today in response to that threat. Because OVDs today affect MVPDs' decisions, they are appropriately treated as participants in the market. Market definition considers future substitution patterns, and the investment decisions of MVPDs are strong evidence of market participants' view of the increased likelihood of consumer substitution between MVPD and OVD services.[16] This effect on investment is significant and could be diminished or even lost altogether if Comcast, through the JV, acquires the ability to delay or deter the development of OVDs.

D.   **The Anticompetitive Effects of the Proposed Transaction**

Antitrust law, including Section 7 of the Clayton Act, protects consumers from anticompetitive conduct, such as firms' acquisition of the ability to raise prices above levels that would prevail in a competitive market. It also ensures that firms do not acquire the ability to stifle innovation. Vertical mergers are those that occur between firms at different stages of the chain of production and distribution. Vertical mergers have the potential to harm competition by changing the merged firm's ability or incentives to deal with upstream or downstream rivals. For example, the merger may give the vertically integrated entity the ability to establish or protect market power in a downstream market by denying or raising the price of an input to downstream rivals that a stand-alone upstream firm otherwise would sell to those downstream firms. The merged firm may find it profitable to forego the benefits of dealing with its rivals in order to hobble them as competitors to its own downstream operations.

---

[16] *Cf.* U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 5.2 (Aug. 19, 2010), *available at* http://www.justice.gov/atr/public/guidelines/hmg-2010.html ("However, recent or ongoing changes in market conditions may indicate that the current market share of a particular firm either understates or overstates the firm's future competitive significance. The Agencies consider reasonably predictable effects or ongoing changes in market conditions when calculating and interpreting market share data.").

A merged firm can more readily harm competition when its rivals offer new products or technologies whose competitive potential is evolving. Nascent competitors may be relatively easy to quash. For example, denying an important input, such as a popular television show, to a nascent competitor with a small customer base is much less costly in terms of foregone revenues than denying that same show to a more established rival with a larger customer base. Even if a vertical merger only delays nascent competition, an increase in the duration of a firm's market power can result in significant competitive harm. The application and enforcement of antitrust law is appropriate in such situations because promoting innovation is one of its important goals.[17] The crucial role of innovation has led at least one noted commentator to argue that restraints on innovation "very likely produce a far greater amount of economic harm than classical restraints on competition," and thus deserve special attention.[18] By quashing or

---

[17] U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* § 1 (Apr. 1995), *available at* http://www.justice.gov/atr/public/guidelines/0558.htm ("The antitrust laws promote innovation and consumer welfare by prohibiting certain actions that may harm competition with respect to either existing or new ways of serving consumers."); *see also* 19A Phillip E. Areeda et al., *Antitrust Law*, ¶ 1902a (2d ed. 2005) ("Our capitalist economic system places a very strong value on competition, not only to reduce costs but also to innovate new products and processes.").

[18] Herbert Hovenkamp, *Restraints on Innovation*, 29 Cardozo L. Rev. 247, 253-54, 260 (2007) ("[N]o one doubts [the] basic conclusion that innovation and technological progress very likely contribute much more to economic growth than policy pressures that drive investment and output toward the competitive level."); *see also* 4B Phillip E. Areeda et al., *Antitrust Law*, ¶ 407a (3d ed. 2007); Willow A. Sheremata, *Barriers to innovation: a monopoly, network externalities, and the speed of innovation*, 42 Antitrust Bull. 937, 938 (1997) ("'[I]n the long run it is dynamic performance that counts.' The speed of innovation is important to social welfare." (quoting F.M. Scherer & David Ross, Industrial Market Structure & Economic Performance 613 (3d ed. 1990))).

delaying the progress of rivals that attempt to introduce new products and technologies, the merged firm could slow the pace of innovation in the market and thus harm consumers.[19]

### 1.       The Importance of Access to NBCU Content

Generally, programmers want to distribute their content in multiple ways to maximize viewers' exposure to the content and the impact of any advertising revenues.  Likewise, distributors must be able to license a sufficient quantity and quality of content to create a compelling video programming service.  A distributor also must gain access to a sufficient variety of content from different sources.  This "aggregation" of a variety of content is important to a distributor's ability to succeed.

NBCU content is extremely valuable to video programming distributors.  NBC is one of the original three broadcast networks and has decades of history and brand name recognition.  It carries general interest content that appeals to a wide variety of viewers.  Surveys routinely rank the NBC network as one of the top four of all broadcast and cable networks.  Similarly, NBCU's USA Network is highly valued and has been rated the top cable network for four of the past five years.  Many of NBCU's other networks – Bravo, CNBC, MSNBC, SyFy – also are highly rated and valued by their audiences.

The proposed transaction would give Comcast, through the JV, control of an important portfolio of current and library content.  The ratings of each NBCU network are based on the popularity of the particular slate of shows currently on that network and can increase or decrease significantly from one television season to the next based on the gain or loss of hit shows.  NBCU also has the ability to switch programming from one network to another, or otherwise make popular content from one network available to another.  Through the JV, Comcast would

---

[19] *See* Sheremata, *supra* note 18, at 944 ("When owners of current technology raise artificial barriers to entry of new technology, opportunities for innovation decline to the detriment of consumers.").

gain the ability to impair emerging OVD competition by withholding or raising the prices of

individual NBCU shows, or of linear feeds of one or more NBCU cable or broadcast networks.

It is reasonable to examine the competitive impact of withholding NBCU content in the

aggregate, rather than analyzing the value of any individual show or network to a competitor,

because an aggregate withholding strategy would have the greatest impact on Comcast's

downstream rivals.

2.     **The Proposed Transaction Increases the JV's Incentive and Ability to Harm Competitors**

*a.     Ability and Incentive to Harm Rival MVPDs*

If the proposed transaction is approved, Comcast through the JV will gain control of

NBCU's content, including a substantial amount of valuable broadcast and cable programming.

Competing MVPDs will be forced to obtain licenses for NBCU content from their rival,

Comcast.  Unlike a stand-alone programmer, Comcast's pricing and distribution decisions will

take into account the impact of those decisions on the competitiveness of rival MVPDs.  As a

result, Comcast will have a strong incentive to disadvantage its competitors by denying them

access to valuable programming or raising their licensing fees above what a stand-alone NBCU

would have found it profitable to charge.

A stand-alone programmer typically attempts to maximize the combined license fee and

advertising revenues from its programming by making its content available in multiple ways.

The JV would continue to value widespread distribution of NBCU content, but it also would

likely consider how access to that content makes Comcast's MVPD rivals better competitors.

This could lead the JV to withhold content altogether or, more likely, to insist on higher fees for

the NBCU content from Comcast's MVPD competitors.  Whether Comcast's rival MVPDs

refuse to purchase the programming or agree to pay the higher fees, Comcast would benefit from

weakening its MVPD rivals.  Likewise, high licensing fees charged to other MVPDs and OVDs will also induce customers to switch to (or stay with) Comcast.  These higher licensing fees will be reflected either in higher subscriber fees or, in the case of MVPDs building alternative cable distribution infrastructures, a smaller level of investment and, consequently, a smaller coverage area for the MVPD competing with Comcast.  In either case, higher licensing fees will reduce pricing pressure on Comcast's MVPD business and increase its ability to raise prices to its subscribers.

By disadvantaging competitors in this manner, Comcast through the JV will cause some of its rivals' customers to seek an alternative MVPD provider.  Many of these dissatisfied customers likely will become Comcast subscribers, making it profitable for Comcast and the JV to increase licensing fees above the stand-alone NBCU levels.  Those increased fees likely will lead to higher prices for subscribers of other MVPDs and perhaps further migration by those subscribers to Comcast.

Licensing disputes in which a major broadcast network has pulled a network signal from an MVPD have resulted in the MVPD's loss of significant numbers of subscribers to its competitors.  Through the formation of the JV, Comcast gains the rights to negotiate on behalf of the seven O&Os that operate in areas where it is the dominant cable company.  It also becomes the owner of the NBC network, which may give it leverage to seek the rights to negotiate on behalf of NBCU's NBC network affiliate television stations, or at least the ability to influence affiliate negotiations, for retransmission consent rights in other areas of the United States.  Comcast, through the JV, can withhold or raise the price of the NBC network to its rivals, thereby causing customers to shift away from the rival.  Other NBCU programming also is

important to consumers, and similar switching behavior could result if the JV were to withhold it from Comcast's rival MVPDs.

Comcast has engaged in such strategies in the past.  For example, Comcast has withheld its RSN in Philadelphia in order to discriminate against, and thereby disadvantage, DBS providers against which Comcast competes in that city.  The DBS providers' market shares are lower and Comcast's subscription fees are higher in Philadelphia than in comparable markets. This appears to have been a profitable strategy for Comcast because the overall benefit to its cable business of retaining subscribers seems to have outweighed the substantial losses associated with failing to earn licensing fees for the withheld RSN from DBS companies.

Post-transaction, Comcast's rival MVPDs would realize that, unlike the stand-alone NBCU, the JV will set higher licensing fees for NBCU that take into consideration Comcast's business profits.  Some MVPDs might find it unprofitable to carry the programming at the prices the JV could command.  Other MVPDs might agree to the JV's increased prices for the NBCU content given the likelihood that they would lose a large number of their subscribers if they did not carry the NBCU content.

Lowering the profitability of Comcast's MVPD rivals also would weaken the incentives of some existing and future entrants to build out their systems, especially in areas Comcast currently serves, weakening the competitive constraints faced by Comcast.  This weakened state of competition would allow Comcast, in turn, to decrease its investments and innovation to improve its own offerings.  Higher subscription fees for Comcast services or decreased investment in improving their quality are less likely to induce customer switching to Comcast's MVPD rivals where those rivals are unable to match its programming or prices.  As a result,

Comcast could reinforce and even increase its dominant market share of video programming distribution in all areas of the country in which it operates.

b.      *Incentive and Ability to Harm OVDs*

Comcast, through the JV, also could discriminate against competing OVDs in similar ways, thereby diminishing the competitive threat posed by individual OVDs and impeding the development of OVDs, generally.  The JV could charge OVDs higher content fees than the stand-alone NBCU would have charged, or impose different terms for NBCU content than Comcast negotiates for itself.  The JV also could withhold NBCU content completely, thereby diminishing OVDs' ability to compete for video programming distribution customers, again to Comcast's benefit.  Either situation could delay significantly the development of OVDs as a competitive alternative to traditional video programming distribution services.

Over the last several years, NBCU has been one of the content providers most willing to experiment with different methods of online distribution.  It was a driving force behind the creation and success of Hulu, and is now a partner in, and major content contributor to, the recently launched Hulu Plus, a subscription version of Hulu.  Prior to the JV announcement, NBCU entered into several contracts with OVDs to distribute its content online through Apple iTunes and Amazon, and on a subscription basis through Netflix.  Allowing the JV to proceed removes NBCU content from the control of a company that supported the development of OVDs and places it in the control of a company that views OVDs as a serious competitive threat.

Finally, Comcast, through the JV, would gain control of NBCU's governance rights and 32 percent ownership interest in Hulu, a current and future competitor to Comcast's MVPD services.  Hulu has achieved significant success since its launch in early 2008.

Each of the media partners in Hulu, including NBCU, contributes content to Hulu and holds three seats on Hulu's Board of Directors.  Significantly, any important or strategic decisions by Hulu require the unanimous approval of all members of the Board.  Comcast's acquisition of NBCU's interest in Hulu would give it the ability to hamper Hulu's strategic and competitive development by refusing to agree to major actions by Hulu, or by blocking Hulu's access to NBCU content.

### 3.  How the Formation of the JV Changes Comcast's Incentives and Abilities

Post-transaction, the JV would gain increased bargaining leverage sufficient to negotiate higher prices or withhold NBCU content from Comcast's MVPD competitors.  Comcast's rival distributors would have to pay the increased prices or not carry the programming.  In either case, the MVPDs likely would be less effective competitors to Comcast, and Comcast would be able to delay or otherwise substantially impede the development of OVDs as alternatives to MVPDs.

All of these activities could have a substantial anticompetitive effect on consumers and the market.  Because Comcast would face less competition from other video programming distributors, it would be less constrained in its pricing decisions and have a reduced incentive to innovate.  As a result, consumers likely would be forced to pay higher prices to obtain their video content or receive fewer benefits of innovation.  They also would have fewer choices in the types of content and providers to which they would have access, and there would be lower levels of investment, less experimentation with new models of delivering content, and less diversity in the types and range of product offerings.

### 4.        Entry Is Unlikely to Reverse the Anticompetitive Effects of the JV

Over the last decade, Comcast and other traditional video distributors benefited from an industry with limited competition and increasing prices,[20] in part because successful entry into the traditional video programming distribution business is difficult and requires an enormous investment to create a distribution infrastructure such as building out wireline facilities or obtaining spectrum and launching satellites.  Accordingly, additional entry into wireline or DBS distribution is not likely in the foreseeable future.[21]  Telcos have been willing to incur some of the enormous costs to modify their existing telephone infrastructure to distribute video, but only in certain areas, and they have recently indicated that further expansion will be limited for the foreseeable future.[22]

OVDs, therefore, represent the most likely prospect for successful competitive entry into the existing video programming distribution market.  However, they face the difficulty of obtaining access to a sufficient amount of content to become viable distribution businesses.  In addition, OVDs rely upon the infrastructure of others, including Comcast, to deliver service to their customers.  After the JV is formed, Comcast will control some of the most significant

---

[20] *See, e.g.*, Report on Cable Industry Prices, *In re Implementation of Section 3 of the Cable Television Consumer Protection and Competition Act of 1992*, 24 F.C.C.R. 259, ¶ 2 & chart 1 (rel. Jan. 16, 2009), http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-09-53A1.pdf (data showing price of expanded basic service increased more than three times the consumer price index (CPI) between 1995 and 2008).

[21] Similarly, it is unlikely that an entrant would attempt to provide a traditional MVPD service with wireless technology, particularly given the difficulty in acquiring spectrum and the costs and risks of constructing such a system.  *See generally* U.S. Dep't of Justice, *Ex Parte* Submission, *In re Economic Issues in Broadband Competition, A National Broadband Plan for our Future*, FCC GN Docket No. 09-51, at 8-11 (filed Jan. 4, 2010), *available at* http://www.justice.gov/atr/public/comments/253393.htm.

[22] *See, e.g.*, Transcript, *Verizon at Credit Suisse Group Global Media and Communications Conference*, at 11 (Mar. 8, 2010), *available at* http://investor.verizon.com/news/20100308/20100308_transcript.pdf.

content needed by OVDs to successfully position themselves as a replacement for traditional video distribution providers.

### 5. Any Efficiencies Arising from the Deal Are Negligible or Not Merger-Specific

The Department considers expected efficiencies in determining whether to challenge a vertical merger.  The potential anticompetitive harms from a proposed transaction are balanced against the asserted efficiencies of the transaction.  The evidence does not show substantial efficiencies from the transaction.

In particular, the JV is unlikely to achieve substantial savings from the elimination of double marginalization.  Double marginalization occurs when two independent companies at different points in a product's supply chain each extract a profit margin above marginal cost. Because each firm in the supply chain treats the other firm's price (in lieu of its marginal cost) as a cost of producing the final good, each firm finds it profitable to produce a lower output than the firms would have produced had they accurately accounted for the social cost of producing the output.  This ultimately results in a lower output (and a higher price to consumers) than would have occurred if the product had been produced by a combined firm.  Despite a higher price, the lower output from double marginalization ultimately results in lower total profits for the entire supply chain.

Vertical mergers often are procompetitive because they enable the merged firm to properly account for costs when determining output and setting a final product price.  The combined firm no longer treats the profit of the other firm as part of the cost of production. Because the combined firm faces lower marginal costs, it may find it profitable to expand output and reduce the final product price.  Lower marginal costs may result in better service, greater product quality or innovation, or other improvements.

In certain industries, however, including the one at issue here, vertical mergers are far less likely to reduce or eliminate double marginalization.  Documents, data, and testimony obtained from Defendants and third parties demonstrate that much, if not all, of any potential double marginalization is reduced, if not completely eliminated, through the course of contract negotiations between programmers and distributors over quantity and penetration discounts, tiering requirements, and other explicit and verifiable conditions.

Other efficiencies claimed by Comcast are not specific to this transaction or not verifiable, or both.  It is unlikely that the efficiencies associated with this transaction would be sufficient to undo the competitive harm that otherwise would result from the JV.

### III.  EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment ensures that Comcast, through the JV, will not impede the development of emerging online video distribution competition by denying access to the JV's content to such competitors.  The proposed Final Judgment also contains provisions that protect Comcast's traditional video distribution competitors.  The proposed Final Judgment thereby protects consumers by eliminating the likely anticompetitive effects of the proposed transaction.

**A.**      **The Proposed Final Judgment Protects Emerging Online Video Competition**

**1.**      **The Proposed Final Judgment Ensures that OVDs have Access to the JV's Video Programming**

The proposed Final Judgment requires the JV to license its broadcast, cable, and film content to OVDs on terms comparable to those in similar licensing arrangements with MVPDs or OVDs.  It provides two options through which an OVD will be able to obtain the JV's content.

Under the first option, set forth in Section IV.A of the proposed Final Judgment, the JV must license linear feeds of video programming to any requesting OVD on terms that are economically equivalent to the terms on which the JV licenses that programming to MVPDs.

Subject to some exceptions, the JV must make available to an OVD any channel or bundle of channels, and all quality levels and VOD rights, it provides to any MVPD with more than one million subscribers.

The terms of the JV's license with the OVD need not match precisely any existing license between the JV and the MVPD, but it must reasonably approximate, in the aggregate, an existing licensing agreement.  That approximation must account for factors, such as advertising revenues and any technical and economic limitations of the OVD seeking a license.

The first option ensures that the JV will not be able to use its control of content to impede competitive pressure exerted on traditional forms of video programming distribution from OVDs that choose to offer linear channels and associated VOD content.  The proposed Final Judgment uses Defendants' own contracts with MVPDs, including MVPDs that do not compete with Comcast, as proxies for the content and terms the JV would be willing to provide to distributors if it did not have the incentive or ability to disadvantage them in order to maintain customers in or drive customers to Comcast's service.

Under the second option, set forth in Section IV.B, the proposed Final Judgment requires the JV to license to an OVD, broadcast, cable, or film content comparable in scope and quality to the content the OVD receives from one of the JV's programming peers.  For example, if an OVD receives each episode of five primetime television series from CBS for display in a subscription VOD service within 48 hours of the original airing, the JV must provide the OVD a comparable set of NBC broadcast television programs, as measured by volume and economic value, for display during the same subscription VOD window.  The requirement applies to all JV content, even non-NBCU content, in order to ensure that the JV cannot undermine the purposes of the proposed Final Judgment by shifting content from one network to another.

While the first option ensures that Comcast, through the JV, will not disadvantage OVD competitors in relation to MVPDs, the second option ensures that the programming licensed by the JV to OVDs will reflect the licensing trends of its peers as the industry evolves.  Because the OVD industry is still developing, the contracts of the JV's peers also provide an appropriate benchmark for determining the terms and conditions under which content should be licensed to OVDs.  The programming peers include the owners of the three major non-NBC broadcast networks (CBS, FOX, and ABC), the largest cable network groups (including News Corporation, Time Warner, Inc., Viacom, and The Walt Disney Company), and the six largest production studios (including News Corporation, Viacom, Sony Corporation of America, Time Warner Inc., and The Walt Disney Company).

If an OVD and the JV are unable to reach an agreement for carriage of the JV's programming under either of these options, an OVD may apply to the Department for permission to submit its dispute to commercial arbitration in accordance with Section VII of the proposed Final Judgment.  The FCC Order requires the JV to license content on reasonable terms to OVDs and includes an arbitration mechanism for resolution of disputes over access to programming. The FCC is the expert communications industry agency, and the Department worked very closely with the FCC in designing effective relief in this case.  For so long as commercial arbitration is available for resolution of disputes in a timely manner under the FCC's rules and orders, the Department will ordinarily defer to the FCC's commercial arbitration process to resolve such disputes.  OVDs are nascent competitors, however, and consistent with the Department's competition law enforcement mandate, the Department reserves the right, in its sole discretion, to permit arbitration pursuant to Section VII to advance the competitive objectives of the proposed Final Judgment.  Although the Department may seek enforcement of

the Final Judgment through traditional judicial process, the arbitration process will help ensure

that OVDs can obtain content from the JV at a competitive price, without involving the

Department or the Court in expensive and time-consuming litigation.[23]   To support the proposed

Final Judgment's requirement that the JV license its programming to OVDs and assist the

Department's oversight of this nascent competition, Comcast and NBCU are required, pursuant

to Sections IV.M and IV.N, to maintain copies of agreements the JV has with any OVD as well

as the identities of any OVD that has requested video programming from the JV.

> ### 2. The Proposed Final Judgment Prevents Comcast, through the JV, from Adversely Affecting Hulu

Section IV.D of the proposed Final Judgment requires Defendants to relinquish their

voting and other governance rights in Hulu, and Section IV.E prohibits them from receiving

confidential or competitively sensitive information concerning Hulu.  As noted above, Hulu is

one of the most successful OVDs to date.  Comcast has an incentive to prevent Hulu from

becoming an even more attractive avenue for viewing video programming because Hulu would

then exert increased competitive pressure on Comcast's cable business.  If the proposed

transaction were to be consummated without conditions, Defendants would hold seats on Hulu's

Board of Directors and could exercise their voting and other governance rights to compromise

strategic and competitive initiatives Hulu may wish to pursue.  Requiring Defendants to

relinquish their voting and governance rights in Hulu, and barring access to competitively

---

[23] Under Section VI of the proposed Final Judgment, Defendants are required to license only video programming subject to their management or control or over which Defendants possess the power or authority to negotiate content licenses.  NBCU has management rights in The Weather Channel, including the right to negotiate programming contracts on its behalf.  NBCU currently is not exercising these rights.  However, Section V.F provides that if the JV exercises them or otherwise influences The Weather Channel, this programming will be covered under the requirements of the proposed Final Judgment.  Similarly, Section V.E exempts The Weather Channel, TV One, FearNet, the Pittsburgh Cable News Channel, and Hulu from the definitions of "Defendants" and other related terms unless the Defendants gain control over those channels or the ability to negotiate or influence carriage contracts for those channels.

sensitive information, will prevent Comcast, through the JV, from interfering with Hulu's competitive and strategic plans.

At the same time, NBCU should not be permitted to abandon its commitments to provide Hulu video programming under agreements currently in place and deny Hulu customers the value of the JV's content.  Therefore, Section IV.G of the proposed Final Judgment requires the JV to continue to supply Hulu with content commensurate with the supply of content provided to Hulu by its other media owners.

### 3. The Proposed Final Judgment Prohibits Defendants from Discriminating Against, Retaliating Against, or Punishing Video Programmers and OVDs

The proposed Final Judgment protects the development of OVDs by prohibiting Defendants from engaging in certain conduct that would deter video programmers and OVDs from contracting with each other.  Section V.A of the proposed Final Judgment prohibits Defendants from discriminating against, retaliating against, or punishing any content provider for providing programming to any OVD.  Section V.A also prohibits Defendants from discriminating against, retaliating against, or punishing any OVD for obtaining video programming, for invoking any provisions of the proposed Final Judgment or any FCC rule or order, or for furnishing information to the Department concerning Defendants' compliance with the proposed Final Judgment.

### 4. The Proposed Final Judgment Prohibits Defendants from Limiting Distribution to OVDs through Restrictive Licensing Practices

The proposed Final Judgment further protects the development of OVDs by preventing Comcast from using its influence either as the nation's largest MVPD or as the licensor, through the JV, of important video programming to enter into agreements containing restrictive contracting terms.  Video programming agreements often grant licensees preferred or exclusive

access to the programming content for a particular time period.  Such exclusivity provisions can be competitively neutral, but also can have either pro- or anticompetitive purposes or effects. Sections V.B and V.C of the proposed Final Judgment set forth broad prohibitions on restrictive contracting practices, including exclusives, but then delineate a narrowly tailored set of exceptions to those bans.  These provisions ensure that Comcast, through the JV, cannot use restrictive contract terms to harm the development of OVDs and, at the same time, preserve the JV's incentives to produce and exploit quality programming.

The video programming distribution industry frequently uses exclusive contract terms that can be procompetitive.  For instance, as discussed above, content producers often sequence the release of their content to various distribution platforms, a practice known as "windowing." These windows of exclusivity enable a content producer to maximize the revenues it earns on its content by separating customers based on their willingness to pay and effectively increasing the price charged to the customers that place a higher value on receiving content earlier.  Exclusivity also encourages the various distributors, such as cable companies, to promote the content during a distribution window by assuring the distributor that the content will not be available through other distribution channels at a lower price.  This ability to price discriminate across types of customers and increase promotion of the content increases the profitability of producing quality programming and encourages the production of more high-quality programming than otherwise would be the case.  Exclusivity also may help a new competitor gain entry to a market by encouraging users to try a service they would not otherwise consider.  For example, an OVD may desire a limited exclusivity window in order to market its exclusive access to certain programming provided by its service.  This unique content makes the service more attractive to consumers and gives them a reason to replace their existing service or try something new.

However, exclusivity restrictions also can serve anticompetitive ends.  As a cable company, Comcast has the incentive to seek exclusivity provisions that would prevent content producers from licensing their content to alternative distributors, such as OVDs, for a longer period than the content producer ordinarily would find economically reasonable, in order to hinder OVD development.  If Comcast could use exclusivity provisions to prevent the JV's peers from licensing content to OVDs that otherwise would obtain the rights to offer the programming, other provisions of the proposed Final Judgment designed to preserve and foster OVD competition could be effectively nullified.

The proposed Final Judgment strikes a balance by allowing reasonable and customary exclusivity provisions that enhance competition while prohibiting those provisions that, without any offsetting procompetitive benefits, hinder the development of effective competition from OVDs.  Section V.B of the proposed Final Judgment prohibits the JV from entering into any agreement containing terms that forbid, limit, or create economic incentives for the licensee to limit distribution of the JV's video programming through OVDs, unless such terms are common and reasonable in the industry.  Evidence of what is common and reasonable industry practice includes, among other things, Defendants' contracting practices prior to the date that the JV was announced, as well as practices of the JV's video programming peers.  This provision allows the JV to employ those pricing and contractual strategies used by its peers to maximize the value of the content it produces, while limiting Comcast's incentives, through the JV, to craft unusually restrictive contractual terms in the JV's contracts with third parties, the purpose of which is to limit the access of OVDs to content produced by the JV.  Section V.C of the proposed Final Judgment prohibits Comcast from entering into or enforcing agreements for carriage of video programming on its cable systems that forbid, limit, or create incentives that limit the provision

of video programming to OVDs.  Section V.C establishes three narrow exceptions to this broad prohibition.  First, Comcast may obtain a 30-day exclusive from free online display if Comcast pays for the video programming.  Second, Comcast may enter into an agreement in which the programmer provides content exclusively to Comcast, and to no other MVPD or OVD,  for 14 days or less.  Third, Comcast may condition carriage of programming on its cable system on terms which require it to be treated in material parity with other similarly situated MVPDs, except to the extent such terms would be inconsistent with the purpose of the proposed Final Judgment.  These provisions are designed to ensure that Comcast, either alone or in conjunction with the JV, cannot use existing or new contracts to dictate the terms of the video programming agreements that the JV's peers are able to offer OVDs, thereby hindering the development of OVDs.

### 5.    The Proposed Final Judgment Prohibits Unreasonable Discrimination in Internet Broadband Access

Section V.G of the proposed Final Judgment requires Comcast to abide by certain restrictions on the operation and management of its Internet facilities.  Without these restrictions Comcast would have the ability and the incentive to undermine the effectiveness of the proposed Final Judgment.  Comcast is the dominant high-speed ISP in much of its footprint and therefore could disadvantage OVDs in ways that would prevent them from becoming better competitive alternatives to Comcast's video programming distribution services.  OVDs are dependent upon ISPs' access networks to deliver video content to their subscribers.  Without the protections secured in the proposed Final Judgment, Comcast would have the ability, for instance, to give priority to non-OVD traffic on its network, thus adversely affecting the quality of OVD services that compete with Comcast's own MVPD or OVD services.  Comcast also would be able to

favor its own services by not subjecting them to the network management practices imposed on other services.

Section V.G.1 of the proposed Final Judgment prohibits Comcast from unreasonably discriminating in the transmission of lawful traffic over its Internet access service, with the proviso that reasonable network management practices do not constitute unreasonable discrimination. This provision requires Comcast to treat all Internet traffic the same and, in particular, to ensure that OVD traffic is treated no worse than any other traffic on Comcast's Internet access service, including traffic from Comcast and NBCU sites. Similarly, Section V.G.2 prohibits Comcast from excluding their own services from any caps, tiers, metering, or other usage-based billing plans, and requires them to ensure that OVD traffic is counted in the same way as Comcast's traffic, and that billing plans are not used to disadvantage an OVD in favor of Comcast. Many high-speed Internet providers are evaluating usage-based billing plans. These plans may more efficiently apportion infrastructure costs across users, offer lower-cost service to low-volume subscribers, or divert high-volume usage to non-peak hours. However, these plans also have the potential to increase the cost of high-volume services, such as video distribution, that may compete with an MVPD's video services. Section V.G.2 addresses this concern by ensuring that under these plans Comcast must treat other OVD services just as it treats its own Internet-based video services.

Specialized Services are offered to consumers over the same last-mile facilities as Internet access services, but are separate from the public Internet. The potential benefits of Specialized Services include the facilitation of services that might not otherwise be technically or economically feasible on current networks and the development of new and innovative services, such as services that may compete directly with Comcast's own MVPD offerings. If Comcast

were to offer online video services through Specialized Services, however, it could effectively avoid the prohibitions in Sections V.G.1 and V.G.2. Sections V.G.3 and V.G.4 recognize both the potential benefits and the risks of Specialized Services and strike a balance to protect the beneficial development of these services while preventing Comcast from using them anticompetitively to benefit its own content. Section V.G.3 prohibits Comcast from offering Specialized Services that are comprised substantially or entirely of the JV's content. Section V.G.4 requires Comcast to allow any OVD access to a Specialized Service if other OVDs, including Comcast, are being offered access. Together, these two provisions ensure that OVDs will have access to any Specialized Service Comcast may offer that includes comparable services.

Finally, Section V.G.5 ensures that Comcast will maintain its public Internet access service at a level that typically would allow any user on the network to download content from the public Internet at speeds of at least 12 megabits per second in markets where it has deployed DOCSIS 3.0. The requirement to maintain service at this speed may be adjusted by the Court upon a showing that other comparable high-speed Internet access providers offer higher or lower speeds. These speeds are sufficient to ensure that Comcast's Internet access services can support the development of OVDs as well as other services that are potentially competitive with Comcast's own offerings.

In interpreting Section V.G and the terms used therein, the Department will be informed by the FCC's Report and Order, *In re Preserving the Open Internet Broadband Industry Practices*, GN Docket No. 90-191 & WC Docket No. 07-52, adopted December 21, 2010.

### B.     The Proposed Final Judgment Preserves Traditional Video Competition

A number of FCC orders issued in prior mergers established a commercial arbitration process for resolution of disputes over access to broadcast network programming and regional sports networks.  The FCC Order approving this transaction requires the JV to license all of its programming to MVPDs, including its cable networks, and includes an arbitration mechanism that contains several enhancements to its existing commercial arbitration process when licensing disputes between Defendants and other MVPDs arise.[24]  The Department believes that these enhancements, combined with the FCC's experience in MVPD arbitration disputes, should protect MVPDs' access to the JV's programming without need of another commercial arbitration mechanism for MVPDs under this proposed Final Judgment.

In addition to the protections contained in the FCC Order, the proposed Final Judgment, in Section V.A, prohibits Defendants from discriminating against, retaliating against, or punishing any MVPD for obtaining video programming, for furnishing any information to the United States about any noncompliance with the proposed Final Judgment, or for invoking the arbitration provisions of the FCC Order.  Section V.D also prevents Defendants from requiring or encouraging their local broadcast network affiliates to deny MVPDs the right to carry the local network signals.  To aid the enforcement of this prohibition, pursuant to Sections IV.J and IV.K, Comcast and NBCU are required to maintain not only their network affiliate agreements, but also all documents discussing whether any of their affiliates has withheld or threatened to withhold retransmission consent from any MVPD.

---

[24] For example, the FCC Order allows an MVPD claimant to demand arbitration of programming on a stand-alone basis in certain circumstances.  It also allows a claimant whose contract with the JV has expired to continue to carry the JV's programming during the pendency of the dispute, subject to a true-up.  The FCC Order also contains further modifications to the arbitration process relating to smaller MVPDs.

C.    **Term of the Proposed Final Judgment**

Section XI of the proposed Final Judgment provides that the Final Judgment will expire

seven years from the date of entry unless extended by the Court.  The FCC Order also lasts for

seven years.  The Department believes this time period is long enough to ensure that the JV

cannot deny access to Comcast's OVD competitors at a crucial point in their development but

otherwise short enough to account for the rapidly evolving nature of the video distribution

market.

### IV.  REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been

injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to

recover three times the damages the person has suffered, as well as costs and reasonable

attorneys' fees.  Entry of the proposed Final Judgment will neither impair nor assist the bringing

of any private antitrust damage action.  Under the provisions of Section 5(a) of the Clayton Act,

15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent

private lawsuit that may be brought against Defendants.

### V.  PROCEDURES AVAILABLE FOR MODIFICATION
### OF THE PROPOSED FINAL JUDGMENT

The Department and Defendants have stipulated that the proposed Final Judgment may

be entered by the Court after compliance with the provisions of the APPA, provided that the

Department has not withdrawn its consent.  The APPA conditions entry upon the Court's

determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the

proposed Final Judgment within which any person may submit to the Department written

comments regarding the proposed Final Judgment.  Any person who wishes to comment should

do so within 60 days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later.  All comments received during this period will be considered by the Department, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment.  The comments and the response of the Department will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> Nancy M. Goodman
> Chief, Telecommunications and Media Enforcement Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth Street, N.W., Suite 7000
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, seeking preliminary and permanent injunctions against Defendants' transaction and proceeding to a full trial on the merits.  The United States is satisfied, however, that the relief in the proposed Final Judgment will preserve competition for the provision of video programming distribution services in the United States.  Thus, the proposed Final Judgment would protect competition as effectively as would any remedy available through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits.

## VII.  STANDARD OF REVIEW UNDER THE APPA
## FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the court shall determine whether entry of the proposed Final Judgment "is in the public interest."  15 U.S.C. § 16(e)(1).  In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

(A)     the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B)     the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A), (B).  In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest."  *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see also United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009-2 Trade Cas. (CCH) ¶ 76,736, 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to enforce the final judgment are clear and manageable.").  *See generally United States v. SBC Comm., Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act).[25]

---

[25] The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended the list of factors to focus on competitive considerations and to address

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *Microsoft*, 56 F.3d at 1458-62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[26] In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the

---

potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Comm.*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

[26] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

remedies perfectly match the alleged violations." *SBC Comm.*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant "due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case").

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court might have imposed a greater remedy if the matter had been litigated). To meet this standard, the Department "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Comm.*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged.").

Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459-60.  As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Comm.*, 489 F. Supp. 2d at 15. In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2).  The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney).  Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Comm.*, 489 F. Supp. 2d at 11.[27]

---

[27] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st

## VIII.  DETERMINATIVE DOCUMENTS

Appendix F to the FCC's Memorandum Opinion and Order, *In re Applications of Comcast Corp., General Electric Co. and NBC Universal, Inc. for Consent to Assign Licenses and Transfer Control of Licensees*, FCC MB Docket No. 10-56 (adopted Jan. 18, 2011), was the only determinative document or material within the meaning of the APPA considered by the Department in formulating the proposed Final Judgment.  The Department will file a notice and link to this document as soon as it is posted on the FCC's website.

---

Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

Dated: January 18, 2011

Respectfully submitted,


_____ /s/
Yvette F. Tarlov (D.C. Bar #442452)
Attorney
Telecommunications & Media Enforcement
Antitrust Division
U.S. Department of Justice
450 Fifth Street, N.W., Suite 7000
Washington, DC  20530
Telephone: (202) 514-5621
Facsimile: (202) 514-6381
Email: Yvette.Tarlov@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>STATE OF CALIFORNIA,<br>STATE OF FLORIDA,<br>STATE OF MISSOURI,<br>STATE OF TEXAS, and<br>STATE OF WASHINGTON,<br><br>   *Plaintiffs,*<br> v.<br><br>COMCAST CORP.,<br>GENERAL ELECTRIC CO., and<br>NBC UNIVERSAL, INC.,<br><br>   *Defendants.* | CASE NO.:<br><br>DECK TYPE:  Antitrust<br><br>DATE STAMP:<br><br>JUDGE: |

**CERTIFICATE OF SERVICE**

  I, Yvette F. Tarlov, hereby certify that on January 18, 2010, I caused a copy of the Competitive Impact Statement to be served upon defendants Comcast Corporation, General Electric Co., and NBC Universal, Inc. by mailing the documents electronically to the duly authorized legal representatives of defendants as follows:

**Counsel for Defendant Comcast Corporation:**

Arthur J. Burke, Esquire
Davis Polk and Wardwell LLP
450 Lexington Avenue
New York, NY  10017
(212) 450-4352
arthur.burke@davispolk.com

Joe Sims, Esquire
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC  20001-2113
(202) 879-3863
jsims@jonesday.com

**Counsel for Defendants General Electric Co. and NBC Universal, Inc.:**

Deborah L. Feinstein, Esquire
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, DC  20004-1206
(202) 942-5015
deborah.feinstein@aporter.com

_____      /s/      _____
Yvette F. Tarlov (D.C. Bar No. 442452)
Hillary B. Burchuk (D.C. Bar No. 366755)
United States Department of Justice
Antitrust Division
Telecommunications & Media Enforcement
     Section
450 Fifth Street, N.W., Suite 7000
Washington, DC  20530
(202) 514-5808
