**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF FLORIDA, STATE OF MISSOURI, STATE OF TEXAS, and STATE OF WASHINGTON,<br><br>　　　　　　　　　*Plaintiffs,*<br><br>　　v.<br><br>COMCAST CORP., GENERAL ELECTRIC CO., and NBC UNIVERSAL, INC.,<br><br>　　　　　　　　　*Defendants.* | CASE:  1:11-cv-00106<br>JUDGE:  Leon, Richard J. |

**FINAL JUDGMENT**

WHEREAS, Plaintiffs, the United States of America and the States of California, Florida,

Missouri, Texas, and Washington, filed their Complaint on January 18, 2011, alleging

that Defendants propose to enter into a joint venture that will empower Defendant

Comcast Corporation to block competition from video programming distribution

competitors in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and

Plaintiffs and Defendants, by their respective attorneys, have consented to the entry of

this Final Judgment without trial or adjudication of any issue of fact or law, and without

this Final Judgment constituting any evidence against or admission by any party

regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, Plaintiffs require Defendants to agree to undertake certain actions and refrain from certain conduct for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have represented to the United States that the actions and conduct restrictions can and will be undertaken and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of Defendants, it is ORDERED, ADJUDGED, AND DECREED:

## I. <u>JURISDICTION</u>

This Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

## II. <u>DEFINITIONS</u>

As used in this Final Judgment:

A.     "AAA" means the American Arbitration Association.

B.     "Affiliated" means directly or indirectly controlling, controlled by, or under common control with a Person.

C.     "Broadcast Network" means The Walt Disney Company (ABC), CBS Inc. (CBS), News Corporation (FOX), NBCU (NBC and Telemundo), or any other Person

that provides live or recorded Video Programming for broadcast over a group of local television stations.

D.     "Broadcast Network Peer" means (1) CBS Inc. (CBS), News Corporation (FOX), or The Walt Disney Company (ABC); or (2) any of the top four Broadcast Networks, measured by the total annual net revenue earned by the Broadcast Network from the broadcast of live or recorded Video Programming over a group of local television stations.  Defendants are not Broadcast Network Peers, even if they are one of the top four Broadcast Networks.

E.     "Business Model" means the primary method by which Video Programming is monetized (*e.g.*, ad-supported, subscription without ads, subscription with ads, electronic sell through, or pay per view/transactional video on demand).

F.     "Cable Programmer" means Time Warner, Inc., The Walt Disney Company, News Corporation, Viacom, Inc., NBCU, or any other Person that provides Video Programming for distribution through MVPDs.  A Person that provides Video Programming to MVPDs solely as a Broadcast Network or as a Network Affiliate, O&O, or local television station operating within its licensed territory is not a Cable Programmer.

G.     "Cable Programmer Peer" means (1) News Corporation, Time Warner, Inc., Viacom, Inc., or The Walt Disney Company; or (2) any of the top five Cable Programmers, measured by the total annual net revenue earned by the Cable Programmer from its cable networks, as reported by SNL Kagan (or another source commonly relied upon in the television industry), excluding revenues earned from regional sports

networks.  Defendants are not Cable Programmer Peers, even if they are one of the top
five Cable Programmers.

      H.    "Comcast" means Comcast Corporation, a Pennsylvania corporation with
its principal place of business in Philadelphia, Pennsylvania, its successors and assigns,
and its Subsidiaries (whether partially or wholly owned), divisions, groups, Partnerships,
and Joint Ventures, and their directors, officers, managers, agents, and employees.

      I.    "Defendants" means Comcast, General Electric, and NBCU, acting
individually or collectively, as appropriate.  Where the Final Judgment imposes an
obligation to engage in or refrain from engaging in certain conduct, that obligation shall
apply to each Defendant individually and to any Joint Venture established by any two or
more Defendants.

      J.    "Department of Justice" means the United States Department of Justice
Antitrust Division.

      K.    "Experimental Deal" means an agreement between an OVD and a Peer for
a term of six months or less.

      L.    "Film" means a feature-length motion picture that has been theatrically
released.

      M.    "Final Offer" means a proposed contract identifying the Video
Programming Defendants are to provide to OVDs pursuant to Section IV.A or IV.B of
this Final Judgment and containing the proposed price, terms, and conditions on which
Defendants will provide that Video Programming.

      N.    "General Electric" means General Electric Company, a New York
corporation with its principal place of business in Fairfield, Connecticut, its successors

and assigns, and its Subsidiaries (whether partially or wholly owned), divisions, groups, Partnerships, and Joint Ventures, and their directors, officers, managers, agents, and employees.

O.    "Hulu" means Hulu, LLC, a Delaware limited liability company with its headquarters in Los Angeles, California, its successors and assigns, and its Subsidiaries (whether partially or wholly owned), divisions, groups, Partnerships, and Joint Ventures, and their directors, officers, managers, agents, and employees.

P.    "Internet Access Service" means a mass-market retail communications service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all Internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up Internet access service.  Internet Access Service does not include virtual private network services, content delivery network services, multichannel video programming services, hosting or data storage services, or Internet backbone services (if those services are separate from Internet Access Services).

Q.    "MVPD" means a multichannel video programming distributor as that term is defined on the date of entry of this Final Judgment in 47 C.F.R. § 76.1200(b).

R.    "NBCU" means NBC Universal, Inc., a Delaware corporation with its principal place of business in New York, New York, its successors and assigns, and its Subsidiaries (whether partially or wholly owned), divisions, groups, Partnerships, and Joint Ventures, and their directors, officers, managers, agents, and employees.

S.    "Network Affiliate" means a local television station that broadcasts some or all of the Video Programming of Defendants' Broadcast Networks (*i.e.*, NBC or

Telemundo). A Network Affiliate is owned and operated by Persons other than Defendants.

T.     "O&O" means a local television station owned and operated by Defendants that broadcasts the Video Programming of one of Defendants' Broadcast Networks (*i.e.*, NBC or Telemundo).

U.     "OVD" means any Person that distributes Video Programming in the United States by means of the Internet or another IP-based transmission path provided by a Person other than the OVD. This definition (1) includes an MVPD that offers Video Programming by means of the Internet or another IP-based transmission path outside its MVPD footprint as a service separate and independent of an MVPD subscription; and (2) excludes an MVPD that offers Video Programming by means of the Internet or another IP-based transmission path to homes inside its MVPD footprint as a component of an MVPD subscription.

V.     "Peer" means any Broadcast Network Peer, Cable Programmer Peer, or Production Studio Peer, its successors, assigns, and any Person that is managed or controlled by any Broadcast Network Peer, Cable Programmer Peer, or Production Studio Peer. Defendants are not Peers.

W.     "Person" means any natural person, corporation, company, partnership, joint venture, firm, association, proprietorship, agency, board, authority, commission, office, or other business or legal entity, whether private or governmental.

X.     "Plaintiff States" means the States of California, Florida, Missouri, Texas, and Washington.

Y.     "Production Studio" means Time Warner, Inc. (Warner Bros. Television and Warner Bros. Pictures), News Corporation (20th Century Fox Television and 20th Century Fox), Viacom, Inc. (Viacom's television production subsidiaries and Paramount Pictures), Sony Corporation of America (Sony Pictures Television and Sony Pictures Entertainment), The Walt Disney Company (Disney-ABC Studios and the Walt Disney Motion Pictures Group), NBCU (Universal Pictures, Focus Films, and Universal Studios), and any other Person that produces Video Programming for distribution through Broadcast Networks or Cable Programmers.

Z.     "Production Studio Peer" means (1) News Corporation, Viacom, Inc., Sony Corporation of America, Time Warner, Inc., or The Walt Disney Company; or (2) any of the top six Production Studios, measured by the total annual net revenue earned by the Production Studio from the sale or licensing of Video Programming.  Defendants are not Production Studio Peers, even if they are one of the top six Production Studios.

AA.    "Qualified OVD" means any OVD that has an agreement with a Peer for the license of Video Programming to the OVD (other than an agreement under which an OVD licenses only short programming segments or clips from the Peer), where the OVD is not Affiliated with the Peer.

BB.    "Specialized Service" means any service provided over the same last-mile facilities used to deliver Internet Access Service other than (1) Internet Access Services, (2) services regulated either as telecommunications services under Title II of the Communications Act or as MVPD services under Title VI of the Communications Act, or (3) Defendants' existing VoIP telephony service.

CC.   "Subsidiary," "Partnership," and "Joint Venture" refer to any Person in which there is partial (25 percent or more) or total ownership or control between the specified Person and any other Person.

DD.   "Value" means the economic value of Video Programming based on, among other factors, the Video Programming's ratings (as measured by The Nielsen Company or other Person commonly relied upon in the television industry for television ratings), affiliate fees, advertising revenues, and the time elapsed since the Video Programming was first distributed to consumers by a Broadcast Network or Cable Programmer.

EE.   "Video Programming" means programming provided by, or generally considered comparable to programming provided by, a Broadcast Network or Cable Programmer, regardless of the medium or method used for distribution, and includes programming prescheduled by the programming provider (also known as scheduled programming or a linear feed); programming offered to viewers on an on-demand, point-to-point basis (also known as video on demand); pay per view or transactional video on demand; short programming segments related to other full-length programming (also known as clips); programming that includes multiple video sources (also known as feeds, including camera angles); programming that includes video in different qualities or formats (including high-definition and 3D); and Films for which a year or more has elapsed since their theatrical release.  For purposes of this Final Judgment, Video Programming shall not include programming over which General Electric possesses ownership or control that is unrelated to its ownership interest in NBCU.

## III.  APPLICABILITY

This Final Judgment applies to Defendants and all other Persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

## IV.  REQUIRED CONDUCT

### Provision of Economically Equivalent Video Programming Terms to OVDs

A.     At the request of any OVD, Defendants shall provide, for distribution to consumers through a linear feed (plus any associated video-on-demand rights), all Video Programming they provide to any MVPD in the United States with more than one million subscribers, on terms that are Economically Equivalent to the terms on which Defendants provide Video Programming to that MVPD.

For purposes of this Section IV.A:

1.     "Economically Equivalent" means the price, terms, and conditions that, in the aggregate, reasonably approximate those on which Defendants provide Video Programming to an MVPD, and shall take account of, among other things, any difference in advertising revenues earned by Defendants through OVD distribution and those earned through MVPD distribution; any limitation of Defendants' legal rights to provide Video Programming as a linear feed over the Internet or other IP-based transmission path; any generally applicable, market-based requirements regarding minimum subscriber and penetration rates; and any other evidence concerning differences in revenues earned by Defendants in connection with the provision of Video Programming to the OVD rather than to an MVPD.

2.      Defendants shall provide to any requesting OVD all Video Programming subject to Defendants' management or control and all Video Programming, including Video Programming owned by another Person, over which Defendants possess the power or authority to negotiate content licenses.

3.      At the request of the OVD, Defendants shall provide any bundle of channels, and all quality formats (*e.g.*, high definition, 3D) and video-on-demand rights that Defendants provide to any MVPD in the United States with more than one million subscribers.

4.      Subject to other provisions of this Section IV.A, Defendants shall not apply to an OVD any terms or conditions contained in Defendants' agreements with MVPDs that would not be technically or economically practicable if applied generally to Video Programming distributed by OVDs (*e.g.*, that the OVD distribute Video Programming over an MVPD system).

5.      In any agreement they enter into with an OVD under this Section IV.A, Defendants may require that the OVD not distribute Defendants' Video Programming to consumers (a) if Defendants' Video Programming constitutes more than 45 percent of the OVD's Video Programming (measured by hours available to subscribers), and (b) until at least one Peer has agreed to provide Video Programming to the OVD (including, if the Defendants agree to provide NBC Video Programming to the OVD, at least one Broadcast Network Peer).

6.      Defendants may condition their provision of Video Programming to an OVD under this Section IV.A on the OVD's (a) agreement not to distribute the Video Programming to consumers through a website promoting or communicating the

availability or accessibility of pornography, gambling, or unlawful activities; (b)

reasonable demonstration of its ability to meet its financial obligations; (c) demonstration

of its ability to satisfy reasonable quality and technical requirements for the display and

secure protection of Defendants' Video Programming; (d) agreement to limit the

distribution of an O&O's Video Programming linear feed solely to that O&O's

designated market area or "DMA"; or (e) agreement to limit the distribution of

Defendants' Video Programming to the territory of the United States.

**Provision of Comparable Video Programming to OVDs**

B.      At the request of any Qualified OVD, Defendants shall provide

Comparable Video Programming to the Qualified OVD on terms that are Economically

Equivalent to the price, terms, and conditions on which the Qualified OVD receives

Video Programming from a Peer.

For purposes of this Section IV.B:

1.      "Economically Equivalent" means price, terms, and conditions

that, in the aggregate, reasonably approximate those on which the Peer provides Video

Programming to the Qualified OVD, and shall take account of, among other things, any

difference between the Value of the Video Programming the Qualified OVD seeks from

Defendants and the Value of the Video Programming it receives from a Peer.

2.      "Comparable" Video Programming means Defendants' Video

Programming that is reasonably similar in kind and amount to the Video Programming

provided by the Peer, considering the volume (*i.e.*, number of channels or shows) of

Video Programming and its Value.

3.      The following, among other types of Video Programming, are not Comparable:

a.      first-day Video Programming and Video Programming distributed after Defendants' first-day distribution of that Video Programming to consumers;

b.      repeat, prior-season Video Programming and original, first-run Video Programming;

c.      non-sports Video Programming and sports Video Programming;

d.      broadcast Video Programming and cable Video Programming;

e.      Video Programming directed to children and Video Programming not directed to children;

f.      local news Video Programming and Video Programming that is not local news;

g.      Film and non-Film Video Programming; and

h.      Film between one and five years from initial distribution and Film over five years from initial distribution.

4.      In any agreement they enter into with an OVD under this Section IV.B, Defendants shall not be required to include exclusivity provisions for Comparable Video Programming even if the Qualified OVD's Peer agreement includes exclusivity provisions, *provided that* the price, terms, and conditions on which Defendants provide Video Programming to the Qualified OVD shall be adjusted so that, in the aggregate,

they reasonably approximate the price, terms, and conditions on which the Peer provides Video Programming to the Qualified OVD.

5.      If a Qualified OVD receives Video Programming from two or more Peers in any single Peer category (*i.e.*, Broadcast Network Peers, Cable Programmer Peers, or Production Studio Peers) and pursuant to the same Business Model, Defendants shall provide, pursuant to this Section IV.B, Video Programming Comparable to the Video Programming of one Peer in that category selected by the Qualified OVD. If a Qualified OVD receives Video Programming from a Peer in two or more Peer categories, Defendants shall provide Video Programming Comparable to the Peer in both or all categories. If a Qualified OVD receives Video Programming from two or more Peers in the same Peer category but pursuant to different Business Models, Defendants shall provide Video Programming Comparable to each Peer pursuant to the Business Model specified in each Peer contract.

6.      In responding to a request from a Qualified OVD to which Defendants have provided Video Programming under this Section IV.B, Defendants shall not be required to provide additional Video Programming unless the Qualified OVD enters into a Video Programming agreement with (a) a Peer in a different Peer category (*i.e.*, Broadcast Network Peers, Cable Programmer Peers, or Production Studio Peers), (b) the same Peer under a different Business Model, or (c) the same Peer for additional Video Programming pursuant to the same Business Model.

7.      At the request of an OVD with which Defendants have an agreement to provide Video Programming that subsequently becomes a Qualified OVD, Defendants shall provide additional or different Video Programming so the Video

Programming Defendants provide to the Qualified OVD (including any Video Programming the Defendants have previously agreed to provide to the OVD) is Comparable to that which the Qualified OVD receives from the Peer.

8.   Defendants may require the Qualified OVD to distribute Video Programming obtained from Defendants pursuant to the Business Model under which the Qualified OVD distributes the Peer's Video Programming.

9.   The number of Experimental Deals to which Defendants, at the request of Qualified OVDs, must respond by providing Comparable Video Programming is limited to the maximum number of Experimental Deals any single Peer has entered into with OVDs.

10.   If a Cable Programmer Peer provides substantially all of its cable channels to a Qualified OVD for distribution to consumers through a linear feed, Defendants may meet their obligation under this Section IV.B to provide Comparable Video Programming by providing to the Qualified OVD and requiring the Qualified OVD to distribute substantially all of Defendants' channels.

### OVD Rights to Commercial Arbitration

C.   If, after negotiations, in which Defendants shall participate in good faith and with reasonable diligence, Defendants and any OVD fail to agree on appropriate Economically Equivalent terms on which Defendants must provide Video Programming under Sections IV.A or IV.B of this Final Judgment or on Comparable Video Programming under Section IV.B of this Final Judgment, the OVD may apply to the Department of Justice (but not to the Plaintiff States) for permission to submit its dispute with Defendants to commercial arbitration in accordance with Section VII of this Final

Judgment.  For so long as commercial arbitration is available for the resolution of such disputes in a timely manner under the Federal Communications Commission's rules and orders, the Department of Justice will ordinarily defer to the Federal Communications Commission's commercial arbitration process to resolve such disputes; *provided that* the Department of Justice reserves the right, in its sole discretion, to permit arbitration under this Final Judgment to advance the competitive objectives of this Final Judgment. Nothing in this Section IV.C shall limit the right of the United States to apply to this Court, pursuant to Section IX of this Final Judgment, either before or in place of commercial arbitration under Section VII of this Final Judgment, for an order enforcing Defendants' compliance or punishing their noncompliance with their obligations under Sections IV.A and IV.B of this Final Judgment.

### Disposition of Control Over Hulu

D.      Within ten days after entry of this Final Judgment, Defendants shall (1) delegate any voting and other rights they hold pursuant to their ownership interest in Hulu in a manner that directs and authorizes Hulu to cast any votes related to such ownership interest in an amount and manner proportional to the vote of all other votes cast by other Hulu owners; and (2) relinquish any veto right or other right to influence, control, or participate in the governance or management of Hulu; *provided that* such delegation and relinquishment shall terminate upon Defendants' complete divestiture of their ownership interests in Hulu.

E.      Defendants shall not read, receive, obtain, or attempt to obtain any confidential or competitively sensitive information concerning Hulu or influence, interfere, or attempt to influence or interfere in the management or operation of Hulu.

Notwithstanding the foregoing, Defendants may request and receive from Hulu regularly prepared, aggregated financial statements and information reasonably necessary for Defendants to exercise their rights to purchase advertising inventory from Hulu and to comply with their obligations under Section IV.G of this Final Judgment.

F.     Defendants shall not obtain or acquire any ownership interest in Hulu beyond that which it possessed on January 1, 2011.  Nothing in this Section IV.F shall prohibit Defendants from receiving a proportional or less than proportional distribution of Hulu equity securities in connection with any future conversion of Hulu into a corporation, *provided that* Defendants' economic share in Hulu may not increase in connection with such distribution.

G.     Defendants shall continue to provide Video Programming to Hulu of a type, quantity, ratings, and quality comparable to that of the Broadcast Network owner of Hulu providing the greatest quantity of Video Programming to Hulu.  Provided that the other current Broadcast Network owners of Hulu renew their agreements with Hulu, Defendants also either shall continue to provide Video Programming to Hulu on substantially the same terms and conditions as were in place on January 1, 2011, or shall enter into agreements with Hulu on substantially the same terms and conditions as those of the Broadcast Network owner whose renewed agreement is the most economically advantageous to Hulu.

## Clear Delineation of Rights

H.     Any agreement Defendants enter into with any Production Studio concerning Defendants' distribution of the Production Studio's Video Programming shall include, unless inconsistent with common and reasonable industry practice and subject to

16

any agreements not prohibited by Section V.B of this Final Judgment, either (1) an express grant by the Production Studio to Defendants of the right to provide the Video Programming to OVDs, or (2) an express retention of that right by the Production Studio.

### Document Retention and Disclosures

I.      Comcast and NBCU shall furnish to the Department of Justice and the Plaintiff States quarterly electronic copies of any communications with any MVPD, OVD, Broadcast Network, Cable Programmer, or Production Studio containing allegations of Defendants' noncompliance with any provision of this Final Judgment.

J.      Comcast and NBCU shall collect and maintain one copy of each of the following agreements, currently in effect or established after entry of this Final Judgment:

1.      each affiliation agreement between Defendants and any Network Affiliate;

2.      each agreement under which a Network Affiliate authorizes Defendants to negotiate on its behalf for carriage or retransmission on MVPDs;

3.      each agreement for the carriage or retransmission of an O&O's or a Network Affiliate's (to the extent Defendants possess the power or authority to negotiate on behalf of the Network Affiliate) Video Programming on an MVPD; and

4.      each syndication agreement under which Defendants provide Video Programming to an O&O or Network Affiliate for distribution to consumers.

K.      Comcast and NBCU shall collect and maintain each document in their possession, custody, or control discussing an O&O's or a Network Affiliate's denial or threat to deny Video Programming to an MVPD or OVD.  Defendants shall notify the

Department of Justice and the Plaintiff States within 30 days of learning that an O&O or a Network Affiliate has denied or threatened to deny Video Programming to any MVPD or OVD.

L.      Comcast and NBCU shall collect and maintain documents sufficient to show the compensation each O&O and each Network Affiliate (about which Comcast or NBCU possesses information) receives from any MVPD or OVD.

M.      Comcast and NBCU shall collect and maintain complete copies of any final agreement or unsigned but operative agreement (1) under which Defendants provide Video Programming (other than short programming segments or clips) to any MVPD or OVD, and (2) for Defendants' carriage or retransmission on their MVPD of Video Programming from a Network Affiliate, a local television station, a Broadcast Network, or a Cable Programmer.  For any ongoing negotiations that have not yet produced a final or operative agreement, Comcast and NBCU shall also collect and maintain electronic copies of the most recent offer made to Defendants by an MVPD or OVD seeking Video Programming or by a Network Affiliate, local television station, Broadcast Network, or Cable Programmer seeking carriage or retransmission on Defendants' MVPD, and Defendants' most recent response or offer to any such Persons.

N.      Comcast and NBCU shall identify for the Department of Justice and the Plaintiff States semiannually

1.      the name of each Person that in writing has requested or submitted to Defendants a contractual offer for Video Programming (other than short programming segments or clips) for distribution to consumers, the date of such Person's most recent

written request or contractual offer, and the date of Defendants' most recent response or offer to such Person; and

2.      the name of each Person that in writing has requested or submitted a contractual offer for carriage or retransmission of the Person's Video Programming on Defendants' MVPD, the date of such Person's most recent written request or contractual offer, and the date of Defendants' most recent response or offer to such Person.

O.      Comcast and NBCU shall collect and maintain each document sent to or received from General Electric relating to (1) Defendants' provision of Video Programming to any MVPD or OVD, (2) any OVD's distribution of any Person's Video Programming to consumers, (3) carriage or retransmission of any Person's Video Programming on Defendants' MVPD, or (4) Defendants' compliance or noncompliance with the terms of this Final Judgment.

## V. **PROHIBITED CONDUCT**

### **Discrimination and Retaliation**

A.      Defendants shall not discriminate against, retaliate against, or punish (1) any Broadcast Network, Cable Programmer, Production Studio, local television station, or Network Affiliate for providing Video Programming to any MVPD or OVD, or (2) any MVPD or OVD (i) for obtaining Video Programming from any Broadcast Network, Cable Programmer, Production Studio, local television station, or Network Affiliate, (ii) for invoking any provisions of this Final Judgment, (iii) for invoking the provisions of any rules or orders concerning Video Programming adopted by the Federal Communications Commission, or (iv) for furnishing information to the United States or

the Plaintiff States concerning Defendants' compliance or noncompliance with this Final Judgment.

## Contractual Provisions

B.     Defendants shall not enter into any agreement pursuant to which Defendants provide Video Programming to any Person in which Defendants forbid, limit, or create economic incentives to limit the distribution of such Video Programming through OVDs, *provided that*, nothing in this Section V.B shall prohibit Defendants from entering into agreements consistent with common and reasonable industry practice. Evidence relevant to determining common and reasonable industry practice may include, among other things, Defendants' contracting practices prior to December 3, 2009, and the contracting practices of Defendants' Peers. Notwithstanding any other provision in this Section V.B, in providing Comparable Video Programming to a Qualified OVD under Section IV.B of this Final Judgment, Defendants may include exclusivity provisions only to the extent those provisions are no broader than any exclusivity provisions in the Qualified OVD's agreement with a Peer.

C.     Defendants shall not enter into or enforce any agreement for Defendants' carriage or retransmission on their MVPD of Video Programming from a local television station, Network Affiliate, Broadcast Network, or Cable Programmer under which Defendants forbid, limit, or create incentives to limit the local television station's, Network Affiliate's, Broadcast Network's, or Cable Programmer's provision of its Video Programming to one or more OVDs, *provided that*, nothing in this Section V.C shall prohibit Defendants from

1.    entering into and enforcing an agreement under which Defendants discourage or prohibit a local television station, Network Affiliate, Broadcast Network, or Cable Programmer from making Video Programming for which Defendants pay available to consumers for free over the Internet within the first 30 days after Defendants first distribute the Video Programming to consumers;

2.    entering into and enforcing an agreement under which the local television station, Network Affiliate, Broadcast Network, or Cable Programmer provides Video Programming exclusively to Defendants, and to no other MVPD or OVD, for a period of time of not greater than 14 days; or

3.    entering into and enforcing an agreement which requires that Defendants are treated in material parity with other similarly situated MVPDs, except to the extent application of other MVPDs' terms would be inconsistent with the purpose of this Final Judgment.

### Control or Influence Over Other Persons

D.    Except as permitted by Section V.B of this Final Judgment, Defendants shall not require, encourage, unduly influence, or provide incentives to any local television station or Network Affiliate to

1.    deny Video Programming to (a) any MVPD that provides Video Programming to consumers in any zip code in which Comcast also provides Video Programming to consumers or (b) any OVD; or

2.    provide Video Programming on terms that exceed its Value.

E.    Notwithstanding any other provisions of this Final Judgment, including the definitions of "Defendant," "Comcast," "NBCU," "General Electric," "Subsidiary,"

"Partnership," or "Joint Venture," unless Comcast, NBCU, or General Electric possesses

or acquires control over The Weather Channel, TV One, FearNet, the Pittsburgh Cable

News Channel, or Hulu, or the right or ability to negotiate for any of those Persons or to

influence negotiations for the provision of any such Person's Video Programming to

MVPDs or OVDs, such Person is not a Defendant subject to the obligations of this Final

Judgment.

      F.     Defendants shall not exercise any rights under any existing management

or operating agreement with The Weather Channel to participate in negotiations for the

provision of any of The Weather Channel's Video Programming to any MVPD or OVD,

to advise The Weather Channel concerning any such negotiations, or to approve or obtain

any information (other than aggregated financial reports) about any agreement between

The Weather Channel and any MVPD or OVD.  If, in the future, Defendants acquire the

right to negotiate for The Weather Channel or to exercise any control or influence over

The Weather Channel's negotiation of agreements with MVPDs or OVDs, Defendants

shall provide The Weather Channel Video Programming to OVDs when required to do so

under Sections IV.A or IV.B of this Final Judgment.

### Practices Concerning Comcast's Internet Facilities

      G.     Comcast shall abide by the following restrictions on the management and

operation of its Internet facilities:

      1.     Comcast, insofar as it is engaged in the provision of Internet

Access Service, shall not unreasonably discriminate in transmitting lawful network traffic

over a consumer's Internet Access Service.  Reasonable network management shall not

constitute unreasonable discrimination.  A network management practice is reasonable if

it is appropriate and tailored to achieving a legitimate network management purpose, taking into account the particular network architecture and technology of the Internet Access Service.

2.      If Comcast offers consumers Internet Access Service under a package that includes caps, tiers, metering, or other usage-based pricing, it shall not measure, count, or otherwise treat Defendants' affiliated network traffic differently from unaffiliated network traffic.  Comcast shall not prioritize Defendants' Video Programming or other content over other Persons' Video Programming or other content.

3.      Comcast shall not offer a Specialized Service that is substantially or entirely comprised of Defendants' affiliated content.

4.      If Comcast offers any Specialized Service that makes content from one or more third parties available to (or that otherwise enables the exchange of network traffic between one or more third parties and) its subscribers, Comcast shall allow any other comparable Person to be included in a similar Specialized Service on a nondiscriminatory basis.

5.      Comcast shall offer Internet Access Service that is sufficiently provisioned to ensure, in DOCSIS 3.0 or better markets, that an Internet Access Service subscriber can typically achieve download speeds of at least 12 megabits per second. The United States or Defendants may petition this Court, based upon a showing that comparable Internet Access Service providers (*e.g.*, Persons using hybrid fiber-coax technology to provide service on a mass-market scale) have generally increased or decreased the speed of their services after the entry of this Final Judgment, to modify Comcast's required download speeds.  This Section V.G does not restrict Comcast's

ability to impose byte caps or consumption-based billing, subject to the other provisions of this Final Judgment.

      6.    Nothing in this Section V.G

          a.    supersedes any obligation or authorization Comcast may have to address the needs of emergency communications or law enforcement, public safety, or national security authorities, consistent with or as permitted by applicable law, or limits Comcast's ability to do so; or

          b.    prohibits reasonable efforts by Comcast to address copyright infringement or other unlawful activity.

## VI. **PERMITTED CONDUCT**

Nothing in this Final Judgment prohibits Defendants from refusing to provide to any MVPD or OVD any Video Programming (1) for which Defendants do not possess copyright rights; (2) not subject to Defendants' management or control or over which Defendants do not possess the power or authority to negotiate content licenses; or (3) the provision of which would require Defendants' to breach any contract not prohibited by Sections V.B or V.C of this Final Judgment.

## VII. **ARBITRATION**

A.    Defendants shall negotiate in good faith and with reasonable diligence to provide Video Programming sought by an OVD pursuant to Sections IV.A and IV.B of this Final Judgment and, upon demand by an OVD approved by the Department of Justice pursuant to Section IV.C of this Final Judgment, shall participate in commercial arbitration in accordance with the procedures herein.

B.      Defendants and an OVD may, by agreement, modify any time periods specified in this Section VII.

C.      Any OVD seeking to invoke commercial arbitration under this Final Judgment must, pursuant to Section IV.C of this Final Judgment, apply to the Department of Justice for permission to do so.  If the Department of Justice determines the commercial arbitration should proceed, the OVD shall furnish a written notice to Defendants and the Department of Justice expressly (1) waiving all rights to invoke any dispute resolution process under Federal Communications Commission orders and rules to resolve a dispute with Defendants concerning the same Video Programming; and (2) stating that the OVD consents to be bound by the terms in the Final Offer selected by the arbitrator.  Arbitration under this Final Judgment is not available if a dispute between an OVD and Defendants concerning the same Video Programming is the subject of any Federal Communications Commission dispute resolution process.  Defendants shall not (a) commence arbitration of any dispute under the arbitration procedures contained in this Final Judgment, or (b) upon receipt of the notice from the OVD that it intends to commence arbitration under this Final Judgment, commence any Federal Communications Commission dispute resolution process to resolve the same dispute with the OVD.

D.      Arbitration pursuant to this Final Judgment shall be conducted in accordance with the AAA's Commercial Arbitration Rules and Expedited Procedures, except where inconsistent with specific procedures prescribed by this Final Judgment. As described below in Sections VII.P and VII.Q, the arbitrator shall select the Final Offer of either the OVD or the Defendants and may not alter, or request or demand alteration

of, any terms of those Final Offers. The decision of the arbitrator shall be binding on the parties, and Defendants shall abide by the arbitrator's decision.

E.      The AAA, in consultation with the United States, shall assemble a list of potential arbitrators, to be furnished to the OVD and Defendants as soon as practicable after commencement of the arbitration. Within five business days after receipt of this list, the OVD and Defendants each may submit to the AAA the names of up to 20 percent of the persons on the list to be excluded from consideration, and shall rank the remaining arbitrators in their orders of preference. The AAA, in consultation with the United States, will appoint as arbitrator the candidate with the highest ranking who is not excluded by the OVD or Defendants.

F.      Defendants shall continue to provide Video Programming to an OVD pursuant to the terms of any existing agreement until the arbitration is completed. If the arbitrator's decision changes the financial terms on which Defendants must provide Video Programming to the OVD, Defendants or the OVD, as the case may be, shall compensate the other based on application of the new financial terms for the period dating from expiration of the existing agreement (plus appropriate interest).

G.      Within five business days of the commencement of an arbitration, the OVD and the Defendants each shall furnish a writing to the other and to the Department of Justice committing to maintain the confidentiality of the arbitration and of any Final Offers and discovery materials exchanged during the arbitration, and to limit the use of any Final Offers and discovery materials to the arbitration. The writing shall expressly state that all records of the arbitration and any discovery materials may be disclosed to the Department of Justice.

H.      Defendants shall not be bound by the provisions of this Section VII if an OVD commences arbitration under this Final Judgment more than 60 days prior to the expiration of an existing Video Programming agreement, or less than 30 days after an OVD first requests Defendants to provide Video Programming under Section IV.A or IV.B of this Final Judgment.

I.      After an OVD receives approval from the Department of Justice, pursuant to Section IV.C of this Final Judgment, the OVD may commence arbitration by filing with the AAA and furnishing to Defendants and to the Department of Justice

1.      an assertion that Defendants must provide Video Programming to the  OVD pursuant to Section IV.A or IV.B of this Final Judgment; and

2.      if the Qualified OVD's assertion is based, pursuant to Section IV.B of this Final Judgment, on Comparable Video Programming provided by a Peer or Peers, each agreement with any such Peers.

J.      Simultaneously with the commencement of arbitration, the OVD must file with the AAA its Final Offer for the Video Programming it believes Defendants must provide.

K.      Within five business days of the commencement of an arbitration, Defendants shall file with the AAA and furnish to the Department of Justice their Final Offer for the Video Programming sought by the OVD.

L.      After the AAA has received Final Offers from the OVD and Defendants, it will immediately furnish a copy of each Final Offer to the other party.

M.      At any time after the commencement of arbitration, the OVD and Defendants may agree to suspend the arbitration, for periods not to exceed 14 days in the

aggregate, to attempt to resolve their dispute through negotiation. The OVD and the Defendants shall effectuate such suspension through a joint writing filed with the AAA and furnished to the Department of Justice. Either the OVD or the Defendants may terminate the suspension at any time by filing with the AAA and furnishing to the Department of Justice a writing calling for the arbitration to resume.

N.     The OVD and the Defendants shall exchange written discovery requests within five business days of receiving the other party's Final Offer, and shall exercise reasonable diligence to respond within 14 days. Discovery shall be limited to the following items in the possession of the parties:

1.     previous agreements between the OVD and the Defendants;

2.     formal offers to renew previous agreements;

3.     current and prior agreements between the Defendants and MVPDs or other OVDs;

4.     current and prior agreements between the OVD and other Broadcast Networks, Cable Programmers, or Production Studios;

5.     records of past arbitrations pursuant to this Final Judgment;

6.     documents reflecting Nielsen or other ratings of the Video Programming at issue or of Comparable Video Programming; and

7.     documents reflecting the number of subscribers to the OVD.

There shall be no discovery or use in the arbitration of documents or information not in the possession, custody, or control of the OVD or the Defendants, of draft agreements or other documents concerning negotiations between the OVD and the Defendants (other than formal offers to renew previous agreements, pursuant to Section VII.N.2 of this

Final Judgment), or of the costs associated with Defendants' production of their Video Programming.

O.     In reaching his or her decision, the arbitrator may consider only documents exchanged in discovery between the parties and the following:

      1.     testimony explaining the documents and the parties' Final Offers;

      2.     briefs submitted and arguments made by counsel; and

      3.     summary exhibits illustrating the terms of Defendants' agreements with  MVPDs or other OVDs or of the party OVD's agreements with other Broadcast Networks, Cable Programmers, or Production Studios.

P.     Arbitrations under Section IV.A of this Final Judgment shall begin within 30 days of the AAA furnishing to the OVD and to the Defendants, pursuant to Section VII.L of this Final Judgment, each party's Final Offer.  The arbitration hearing shall last no longer than ten business days, after which the arbitrator shall have five business days to inform the OVD and the Defendants which Final Offer best reflects the appropriate Economically Equivalent terms under Section IV.A of the Final Judgment.

Q.     Arbitrations under Section IV.B of this Final Judgment shall be conducted in two stages, the first of which shall begin within 30 days of the AAA furnishing to the Qualified OVD and to the Defendants, pursuant to Section VII.L of this Final Judgment, each party's Final Offer.  The first stage shall last no longer than ten business days, after which the arbitrator shall have five business days to inform the Qualified OVD and the Defendants which Final Offer encompasses the appropriate Comparable Video Programming under Section IV.B of this Final Judgment.  Within five business days of the arbitrator's decision, the Qualified OVD and the Defendants shall file with the AAA,

furnish to the Department of Justice, and exchange revised Final Offers containing

proposed financial terms for the Comparable Video Programming selected by the

arbitrator.  The second stage of the arbitration shall commence within ten days of the

exchange of the revised Final Offers and shall last no longer than ten business days, after

which the arbitrator shall have five business days to inform the Qualified OVD and the

Defendants which Final Offer best reflects the appropriate Economically Equivalent

terms under Section IV.B of this Final Judgment.

## VIII.  COMPLIANCE INSPECTION

A.      For purposes of determining or securing compliance with this Final

Judgment, or of determining whether the Final Judgment should be modified or vacated,

and subject to any legally recognized privilege, from time to time duly authorized

representatives of the Department of Justice, including consultants and other persons

retained by the Department of Justice, shall, upon written request of an authorized

representative of the Assistant Attorney General in charge of the Antitrust Division, and

on reasonable notice to Defendants, be permitted

1.      access during the Defendants' office hours to inspect and copy, or

at the option of the United States, to require Defendants to provide to the United States

and the Plaintiff States hard copy or electronic copies of, all books, ledgers, accounts,

records, data, and documents in the possession, custody, or control of Defendants,

relating to any matters contained in this Final Judgment, including documents Defendants

are required to collect and maintain pursuant to Sections IV.J, IV.K, IV.L, IV.M, or IV.O

of this Final Judgment; and

2.       to interview, either informally or on the record, the Defendants'
officers, employees, or agents, who may have their individual counsel present, regarding
such matters.  The interviews shall be subject to the reasonable convenience of the
interviewee and without restraint or interference by Defendants.

B.       Upon the written request of an authorized representative of the Assistant
Attorney General in charge of the Antitrust Division, Defendants shall submit written
reports or respond to written interrogatories, under oath if requested, relating to any of the
matters contained in this Final Judgment as may be requested.  Written reports authorized
under this paragraph may, at the sole discretion of the United States (after consultation
with the Plaintiff States), require Defendants to conduct, at their cost, an independent
audit or analysis relating to any of the matters contained in this Final Judgment.

C.       No information or documents obtained by the means provided in this
section shall be divulged by the United States to any person other than an authorized
representative of (1) the executive branch of the United States, (2) the Plaintiff States, or
(3) the Federal Communications Commission, except in the course of legal proceedings
to which the United States is a party (including grand jury proceedings), or for the
purpose of securing compliance with this Final Judgment, or as otherwise required by
law.

D.       If at the time information or documents are furnished by a Defendant to
the United States and the Plaintiff States, the Defendant represents and identifies in
writing the material in any such information or documents to which a claim of protection
may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and the
Defendant marks each pertinent page of such material, "Subject to claim of protection

under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States and the Plaintiff States shall give the Defendant ten calendar days notice prior to divulging such material in any civil or administrative proceeding.

## IX. **RETENTION OF JURISDICTION**

This Court retains jurisdiction to enable any party to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions. Notwithstanding the foregoing, the Plaintiff States shall have no right to apply to the Court for further orders or directions with respect to Sections IV.C, IV.D, IV.E, IV.F, V.G, or VII of this Final Judgment. In particular, the Plaintiff States shall not be able to apply to this Court to carry out, construe, modify, enforce, or punish violations of Sections IV.C, IV.D, IV.E, IV.F, V.G, or VII of this Final Judgment.

## X. **NO LIMITATION ON GOVERNMENT RIGHTS**

Nothing in this Final Judgment shall limit the right of the United States or the Plaintiff States to investigate and bring actions to prevent or restrain violations of the antitrust laws concerning any past, present, or future conduct, policy, or practice of the Defendants.

## XI. **EXPIRATION OF FINAL JUDGMENT**

Unless this Court grants an extension, this Final Judgment shall expire seven years from the date of its entry.

## XII.  PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest.  The parties have complied

with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16,

including making copies available to the public of this Final Judgment, the Competitive

Impact Statement, and any comments thereon and the United States' responses to

comments.  Based upon the record before the Court, which includes the Competitive

Impact Statement and any comments and response to comments filed with the Court,

entry of this Final Judgment is in the public interest.

Date: ___9/1/11___

Court approval subject to procedures
set forth in the Antitrust Procedures
and Penalties Act, 15 U.S.C. § 16

United States District Judge